[Civ. No. 17287. Fourth Dist., Div. Two. June 16, 1977.]

LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff,
Cross-complainant and Respondent, v.
ALTFILLISCH CONSTRUCTION COMPANY, Defendant;
CONEXCO, INC., Intervener, Cross-defendant and Appellant.

**COUNSEL**

Roy B. Woolsey for Intervener, Cross-defendant and Appellant.

Virgil R. Wells and J. D. Wells for Plaintiff, Cross-complainant and Respondent.

No appearance for Defendant.

## OPINION

## McDANIEL, J.—

### PREFACE

The plaintiff began the action in the trial court as supposed subrogee of its insured, the eventual intervener and cross-defendant, after plaintiff had paid a casualty claim for property damage to a scraper leased to the defendant by its insured's predecessor. The eventual judgment which is before us on appeal resulted in a recovery by plaintiff of what it had paid to its insured in settlement of the casualty claim. The reason for this result is traceable to an agreement between the insured and its lessee that the former would insure lessee against risks resulting from its possession and use of the scraper. This undertaking was given in consideration for the lessee's payment to the insured of a specified cash premium. The legal result of the agreement noted was to cut off any possible subrogation rights which the plaintiff would have had after payment of any loss to its insured because of damage to the scraper resulting from lessee's negligence. When this agreement came to light after the litigation had begun, the plaintiff cross-complained against its intervening insured on the theory that the policy had been thereby breached and that plaintiff was entitled to return of its money. The trial court agreed and so do we. The judgment is therefore affirmed.

### FACTS[1]

On or about October 21, 1968, the Euclid Division, sometimes also known as the Earthmoving Equipment Division of General Motors Corporation, leased a certain 1969 model Terex Scraper, S/N47LOT

---

[1] The series of transactions which finally presented the issue for decision are somewhat detailed and complex. To guide the reader in search of the precedential impact of this case, the facts may be paraphrased as follows. A issued a casualty insurance policy to B insuring B's personal property. The policy contained the standard subrogation clause which stated that the insured should do nothing after loss to prejudice the insurer's rights. B then leased the personal property to C and agreed that it would obtain insurance to cover C's operation of the property. However, B never arranged for any additional insurance; neither did it advise A of its agreement with C. The property was then damaged by C's negligence. C had been relieved of any financial responsibility for the loss because of the agreement with B. B claimed a right to payment of the loss under its policy with A, but A claimed that it was under no duty to pay because B had breached the policy by contracting away, before the loss, A's opportunity to proceed by subrogation against C. The issue then is to determine whether the loss should fall upon A or B.

52040-80SH 20793 to Altfillisch-Fulton, later known as Altfillisch Construction Company (Altfillisch). Under the terms and conditions of the lease, accepted and agreed to by Altfillisch, was a provision that "Lessee will be responsible for insuring the [unit]. A unit value of $165,000.00 each should be used for insurance purposes only." Earlier, Conexco, Inc., (Conexco) had leased certain other scrapers to Altfillisch under terms which required the lessee to be responsible for insuring them. After the lease noted and before March 17, 1970, George J. Barry, an employee of Conexco, telephoned Altfillisch to report he had learned that the insurance carried by Altfillisch on the other leased scrapers was about to expire. The Altfillisch representative who answered the call stated that Altfillisch was having trouble obtaining insurance and asked if Conexco could arrange for the insurance. The Altfillisch representative at that time also stated that Altfillisch would pay the premium to the extent that it was for coverage of equipment leased to Altfillisch. Also before March 17, 1970, Mr. Barry called Altfillisch again and reported that arrangements had been made to cover the scraper with insurance and that premiums attributable thereto would be billed to Altfillisch by Conexco. In fact no such arrangements were ever made.

On or about March 17, 1970, Euclid Division assigned to Conexco the lease of two scrapers, including the one particularly described above, on which Altfillisch was the lessee. On March 17, 1970, Altfillisch executed a written approval and acceptance of the assignment. As a result, Conexco then stood in the position of owner-lessor and Altfillisch stood in the position of lessee of the particular scraper noted.

On March 25, 1970, Conexco billed Altfillisch for $952.20 for insurance coverage from 3-25-70 to 4-25-70 on six scrapers, including No. 80SH-20793 at the rate of 90 cents per $1,000 of property valuation. On April 29, 1970, Conexco billed Altfillisch again for $952.20, for insurance coverage from 4-26-70 to 5-25-70 on the same scrapers. The latter billing, invoice No. 0147, was paid by Altfillisch on May 8, 1970.

On May 8, 1970, the particular scraper noted was substantially damaged because of the negligence of Altfillisch employees. At the time of this damage, there was in force an insurance policy issued to Conexco by Liberty Mutual Insurance Company (Liberty), a so-called conditional sales floater, the coverage of which extended to the damaged scraper. The premium deposit on this policy was at the rate of 60 cents per $1,000 of property valuation.

Included in the Liberty policy as condition No. 17 was a standard subrogation clause which is quoted in its entirety later in the opinion.

After the damage to the scraper, Conexco submitted a proof of loss to Liberty for $15,170.71, and thereupon Liberty paid Conexco $14,920.71, being the amount of the loss claimed less the $250 deductible. During the course of the negotiations leading up to the payment of Conexco's claim by Liberty, the entire file on the transaction between Conexco and Altfillisch pertaining to this scraper, including copies of the billings for insurance, was submitted to Liberty. However, there is nothing in the record to indicate that the file contained any reference to the oral undertaking by Mr. Barry of Conexco to obtain the insurance coverage for Altfillisch.

### PROCEEDINGS UP TO JUDGMENT

Having made the adjustment under its policy, Liberty proceeded as supposed subrogee to bring suit against Altfillisch to recover from the responsible tortfeasor an amount equal to what had been paid to Conexco in fulfillment of the casualty coverage. Altfillisch cross-complained on the theory that it was a named insured under the Liberty policy issued to Conexco. Conexco then filed a complaint in intervention to block the subrogation effort on the theory that it had contracted away its right to recover from Altfillisch for any damage to the scraper and that therefore no right of subrogation was available to Liberty notwithstanding payment of the $14,920.71 claim. Faced with this circumstance, Liberty then cross-complained to recoup the money paid to Conexco.

At the trial, Altfillisch successfully extricated itself from the case by means of a motion under section 631.8 of the Code of Civil Procedure which was granted. That rendered its cross-complaint moot. After its notice of intended decision, the court made and filed its findings of fact which embodied the foregoing synopsis. Based on such findings, the trial court concluded:

"1. That said oral agreement by CONEXCO to furnish insurance to ALTFILLISCH precluded any . . . action on behalf of CONEXCO as against ALTFILLISCH for . . . damage to said TEREX SCRAPER by ALTFILLISCH.

"2. That said oral agreement by CONEXCO to furnish insurance to ALTFILLISCH precluded any . . . rights of subrogation on behalf of LIBERTY . . . against ALTFILLISCH for any . . . damage to said TEREX SCRAPER.

"3. That said oral agreement between CONEXCO and ALTFILLISCH constituted a material fact affecting the substantive rights of LIBERTY under its policy of insurance No. MC-742-05357-089 issued to CONEXCO.

"4. That CONEXCO violated a material condition of said insurance policy in ... that it ... contracted away its right to recover from the lessee ALTFILLISCH for damages done to said scraper while in the possession of ALTFILLISCH, thereby precluding LIBERTY from its right of subrogation against ALTFILLISCH ...

"5. That said violation of the material conditions of said insurance policy voided said policy in its entirety as to the above described loss, thereby entitling LIBERTY to reimbursement from CONEXCO of ... funds previously paid under said policy for said loss, namely $14,920.71."

Judgment was entered accordingly, and Conexco appealed.

### ISSUES, DISCUSSION AND DISPOSITION

The findings are not challenged. This dispute is over the legal consequences of what all agree took place. In our view, it is of no moment that the posture of the parties finds Liberty attempting to recover what it had paid to Conexco. The ultimate issue is whether Conexco had a right to payment from its insurer, Liberty, for the damage to the scraper. Obviously, if Liberty had known of the Altfillisch-Conexco agreement before it paid the claim, it would not have paid. In such event, Conexco would have sued Liberty on the policy, rather than what we have here in the form of an effort by Liberty to recover what it had formerly paid. For these same reasons we do not believe that any claimed concealment early on of the agreement between Conexco and Altfillisch should have any bearing on the outcome. However, for whatever significance this aspect of the case may have, the record readily supports an implied finding that, at the time it paid the loss claim of Conexco, Liberty did not know of Conexco's oral agreement to insure Altfillisch. Otherwise, the course of the proceedings makes no sense.

Reduced to its essentials, we see the question to be whether the making of the agreement between Conexco and Altfillisch (which had the legal effect of cutting off Conexco's opportunity to recover from Altfillisch for damage to the scraper) operated to relieve Liberty of its contractual duty to pay Conexco for any damage to the scraper which otherwise Liberty would have been obligated to pay under the terms of

the policy. The answer to this question depends on an interpretation of the policy.

■ We agree with Conexco that ambiguities in the language of an insurance policy must be resolved against the insurer. On this point, Conexco points to Condition No. 17 of the policy which reads, "SUBROGATION. In the event of any payment under this policy the company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights." Conexco then argues that the explicit prohibition of acts *after* loss which would prejudice the insurer's rights of subrogation supports the possible interpretation that acts *before* loss which prejudice such rights are permitted. This possibility, it is further argued, introduces the ambiguity which must be resolved in favor of an interpretation which would permit Conexco to make the agreement it did with Altfillisch and not thereby breach the policy conditions. To this all we can concede is, "nice try."

The flaw in Conexco's reasoning here is that there is no such animal as a "right of subrogation *before* loss." Such a right remains inchoate before loss and only matures into a legal concept after a loss to the insured property occurs. Stated otherwise, it would be impossible to prejudice a right of subrogation before loss, because there is nothing yet in being to prejudice. Accordingly, the quoted provision of the policy by no stretch of reasonable interpretation could be construed as contemplating, let alone permitting, the oral agreement between Conexco and Altfillisch. Hence, there is no ambiguity in condition No. 17 to be resolved against Liberty.

The question remains to identify the provision of the policy involved which led the trial court, in its conclusions of law, correctly to state that "CONEXCO violated a material condition of said insurance policy . . . [and] [t]hat said violation of the material conditions of said insurance policy voided said policy in its entirety as to the above described loss . . ."

The inclusion in the policy of condition No. 17 dealing with the prospective right of subrogation reflects the economic facts of life in the insurance industry. The fixing of reserves and the actuarial process by which premiums are calculated take into account the probabilities of a projected percentage of recoveries from third party tortfeasors against whom the insurer will be subrogated. Either in aid of this factor or

because of it, the law in many jurisdictions is that an insured who gives a release to one responsible for damaging property of the insured, thereby cutting off the insurer's right of subrogation against the tortfeasor, loses his right of action against the insurer under the policy. (See Annot. 38 A.L.R.2d 1095 and cases therein cited.) As a consequence of the foregoing, we see the inclusion of condition No. 17 in the Liberty policy as indication of a certain climate or level of economic expectations under which the policy was contracted for and issued.

■ In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which impairs the right of the other to receive the benefits of the agreement. (*Brown* v. *Superior Court,* 34 Cal.2d 559, 564 [212 P.2d 878].) This principle is applicable to policies of insurance. (*Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d 654, 658 [328 P.2d 198].)

The presence of this implied covenant as a part of all insurance contracts has been increasingly the source of spectacular jury awards based on tort theory such as to enable the imposition of exemplary damages. (See *Fletcher* v. *Western National Life Ins. Co.,* 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286], and its progeny.) ■ Moreover, as stated in *Gruenberg* v. *Aetna Ins. Co.,* 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032], "[w]e conclude, therefore, that the duty of good faith and fair dealing on the part of defendant insurance companies is an absolute one. . . . [T]he nonperformance by one party of its contractual duties cannot excuse a breach of the duty of good faith and fair dealing by the other party while the contract between them is in effect and not rescinded." (*Id.,* at p. 578.)

Faced with this sweeping and portentous pronouncement on the force and dignity of such covenants, we find no difficulty in construing the scope of their impact to devolve alike upon the insured as well as the insurer and that a breach thereof by the insured would lead to the same legal consequences as any garden variety breach of contract. Thus it is here. Given Liberty's expectation of opportunities to subrogate in the event of payment of a loss caused by the negligence of a third party, it was clearly a breach of the insured's implied covenant of good faith and fair dealing for Conexco to frustrate that expectation by contracting away such opportunity before the loss occurred.

The equities also support the result which this interpretation of the policy imports. Conexco charged Altfillisch 90 cents per $1,000 of valuation coverage, whereas Conexco paid Liberty only 60 cents per $1,000 of valuation coverage. With these the facts, we could inquire what the 30 cent differential was for. If Conexco and Altfillisch understood that the latter's interests were to be fully covered by the existing Liberty policy, it would have been unnecessary to require a premium in excess of what Conexco was paying Liberty. The only logical conclusion to be reached in view of the surcharge is that Conexco was charging Altfillisch for coverage in addition to that already provided under the policy, i.e., coverage of the lessee Altfillisch's exposure deriving from its possession and use of the scraper.

In the case at bench, Liberty paid the loss sustained by the insured and sought recovery from the responsiblty tortfeasor in accordance with the subrogation clause in the policy. It was then met, for the first time, with the argument from the tortfeasor that it too was insured for this loss by virtue of an undisclosed oral agreement with the named insured. The equitable question then became: Who assumed the duty of insuring the tortfeasor? As we see it, the equitable insurer of the tortfeasor was actually Conexco. Conexco orally contracted to procure insurance on behalf of the tortfeasor and Conexco accepted premium payments for this purpose. Conexco then retained the premiums without actually procuring any additional insurance or advising Liberty of its arrangement with the tortfeasor. As decided by the trial court, the ultimate loss in this action was fixed on the party who actually contracted to assume the risk of that loss and who was paid for doing so, unquestionably an equitable result.

However, aside from the equities, we hold that the agreement between Conexco and Altfillisch, which had the legal effect of cutting off Liberty's opportunities for subrogation against the tortfeasor Altfillisch, breached an implied condition of the policy and thus operated to relieve Liberty of any obligation to pay Conexco for damage to the scraper chargeable to the acts of Altfillisch.

The judgment is affirmed.

Gardner, P. J., and Kaufman, J., concurred.

A petition for a rehearing was denied July 7, 1977, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied August 11, 1977.