[No. B125217. Second Dist., Div. Two. Feb. 26, 1999.]

AGRICULTURAL INSURANCE COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
MKDG/RHODES SC PARTNERSHIP et al., Real Parties in Interest.

386

## COUNSEL

Mendes & Mount, Charles G. Carluccio, Ty S. Vanderford and Yvonne T. Simon for Petitioner.

No appearance for Respondent.

Shernoff, Bidart, Darras & Arkin, William Shernoff, Michael J. Bidart, Sharon J. Arkin; Gibbs, Giden, Locher & Acret, Theodore L. Senet, Jeriel C. Smith and Steven R. Cuneo for Real Party in Interest MKDG/Rhodes SC Partnership.

## OPINION

**ZEBROWSKI, J.**—This case arises out of an insurance claim for earthquake damage. After the insurer paid the claim in part, controversies arose. The insureds then sued for bad faith and breach of contract. The trial court stayed the action to allow the insurer to complete its investigation. The insurer did, and then cross-complained, contending that the insureds' claim was in significant part falsified. The insurer pleaded various contract theories, and also the tort theories of "reverse bad faith" (tortious breach of the covenant of good faith and fair dealing by the insureds) and fraud. The insureds demurred to the tort theories, and the trial court sustained without leave to amend. In addition, the trial court struck the insurer's prayer for punitive damages and attorney's fees.

The insurer then filed its initial petition for writ of mandate directly in the Supreme Court. The Supreme Court declined to accept direct review, and instead referred the petition to this court. This court issued an alternative writ and a stay. The insureds then advised that a contractual appraisal proceeding was underway. In view of the pending appraisal proceeding, this court vacated its stay and alternative writ, and denied the insurer's petition without prejudice to renewal after completion of the appraisal. After the appraisal was completed, the insurer filed a second petition contesting the same trial court ruling. This court then granted a second alternative writ, and we now grant the petition in part and deny it in part.[1]

An insurer has no claim against its insured in tort for breach of the covenant of good faith and fair dealing. A breach of this covenant is, at base,

---

[1]In addition to the "reverse bad faith" and fraud causes of action considered in this opinion, the insurer also pleaded negligent misrepresentation. The insureds' demurrer to that theory was also sustained without leave. The insurer's writ petition nominally requested issuance of a writ with reference to this negligence claim also. However, none of the negligence issues

a breach of contract. A relationship including specialized circumstances of reliance and dependence is necessary to transmute such a contractual breach into a tort. Such circumstances do not exist in the context of an insured's responsibilities toward its insurer, or in the reciprocal context of an insurer's legitimate expectations from its insured. Although a false claim by an insured might trigger adverse contractual or penal consequences, the obligations undertaken by an insured in entering into an insurance contract are simply not of the same character as the obligations undertaken by an insurer. Hence an insured does not bear a risk of affirmative tort liability for failing to perform the panoply of indefinite but fiduciary-like obligations contained within the concept of "insurance bad faith." The trial court therefore correctly sustained the insured's demurrer to the insurer's "reverse bad faith" claim, and the insurer's petition will be denied to that extent. A tort claim for "reverse bad faith" was the only basis on which the insurer might have been entitled to an award of attorney's fees; thus the trial court was also correct in striking the attorney's fee claim. The petition will also be denied to that extent.

Although an insured does not bear the type of obligations which can give rise to a claim for tortious breach of covenant, an insured—no different than everyone else—has a duty not to defraud. Firstly, an insured must not defraud in the procurement of the policy. Secondly, an insured must not defraud in making a claim on the policy. When an insured makes a claim to its insurer, the insurer's duty to investigate is triggered. If, because of the insured's false factual assertions, the insurer incurs expenses that would otherwise not have been necessary, justifiable detrimental reliance can be pleaded by the insurer. Although a mere inflated opinion of a claim's value is not fraud, deliberately false factual assertions can be fraud. There is a significant distinction between a mere aggressive claims position and an outright factual fraud. Hence the insurer's petition will be granted to the extent of directing the trial court to vacate its order sustaining without leave to amend as to the fraud cause of action, and to consider whether an amendment to plead with greater specificity is required. It follows that the

(such as the scope of an insured's duty of care in making an insurance claim, how that duty might differ from an insured's contractual duties, whether the measure of damages would be any different, etc.) have been briefed. The request for writ relief as to the negligence issues has therefore been waived. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, pp. 627-629; Code Civ. Proc., § 1110.) Moreover, it facially appears that any negligence law duty of care which might devolve upon an insured when that insured enters into an insurance contract would be coterminous with the insured's contractual duties. Inasmuch as Agricultural Insurance Company is pursuing its contractual remedies, the sustaining of the demurrer to Agricultural's negligence claim appears harmless even if erroneous. The negligence issue therefore does not appear to be a proper subject for extraordinary writ relief. At least the contrary has not been demonstrated by the papers filed. In view of this factor plus the waiver by lack of briefing, we do not deal with the negligence issue further.

order striking the insurer's claim for punitive damages must also be vacated, and the writ will also be granted to that extent.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. *The Parties.*

Petitioner Agricultural Insurance Company issued an insurance policy providing earthquake coverage to a health club in Los Angeles known as "Sports Club/LA."[2] The policy included several named insureds, one of whom was MKDG/Rhodes SC Partnership. The other insureds all assigned their insurance claims to MKDG.

### B. *MKDG Sues.*

In 1995, MKDG sued Agricultural alleging, among other things, bad faith and breach of contract.

### C. *MKDG's Suit Is Stayed; Agricultural Investigates the Claim.*

The trial court stayed MKDG's suit to allow Agricultural to complete its investigation. Agricultural then conducted examinations under oath pursuant to the insurance contract. Agricultural contends that the insureds would not permit some of the examinations requested, and that they obstructed Agricultural's investigation by withholding documents and interfering with Agricultural's attempts to inspect the earthquake-damaged Sports Club/LA.

Agricultural's investigation allegedly revealed that the insureds had deliberately misrepresented and concealed material facts. Accordingly, Agricultural denied the claim, declared the policy void, and demanded the refund of money previously paid.

### D. *Agricultural Cross-complains.*

The insureds did not refund the money previously paid, and Agricultural then filed a cross-complaint against MKDG and the other insureds. In its

---

[2]Sports Club/LA had $20 million of coverage issued by four carriers, covering (1) the replacement cost of damaged property, including code upgrades, (2) business interruption income, and (3) extra expenses incurred to continue operations, expedite rebuilding and mitigate losses. There were two primary carriers, each with $5 million policies, co-insuring $10 million of primary coverage. Agricultural was one of two excess carriers, co-insuring a $10 million excess layer, each sharing 50 percent of the total excess risk. The other insurers settled the claims against their policies; only Agricultural is involved in this litigation.

cross-complaint, Agricultural pleaded the two tort claims under consideration here: intentional misrepresentation (fraud), and breach of the implied covenant of good faith and fair dealing ("reverse bad faith").

■ Since this matter arises after a demurrer, we must assume the truth of all properly pleaded material allegations. (See, e.g., *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].) In addition, especially since the insureds' demurrer to Agricultural's fraud cause of action was only on grounds of lack of sufficient specificity, we consider whether it appears reasonably possible that Agricultural could amend to cure any defects in specificity. (See, e.g., *Breitegger* v. *Columbia Broadcasting System, Inc.* (1974) 43 Cal.App.3d 283, 290 [117 Cal.Rptr. 699] [plaintiff to be given opportunity to amend if reasonable possibility of successful amendment].)

Construing the allegations of the cross-complaint liberally, and taking into account what Agricultural indicates in its briefing that it could additionally allege, Agricultural contends as follows: At the time that it originally opened, Sports Club/LA was not in compliance with various mandatory building, disabled access, and health and safety codes, and was otherwise defective. The cross-complaint implies, although it does not expressly state, that these deficiencies were not revealed to Agricultural. The cross-complaint does plead "that the insured deliberately misrepresented material facts and concealed other material facts regarding the application for insurance," implying that misrepresentation and lack of disclosure may have fraudulently induced the policy of insurance now in issue. In any event, at the time that Sports Club/LA was damaged by the Northridge earthquake on January 17, 1994, it was allegedly already in need of building code upgrade and other remedial work, and the need to perform such work was therefore not caused by the earthquake.

At the time of the earthquake, MKDG was in the process of selling its 50 percent interest in Sports Club/LA to David Talla, who already owned the other 50 percent. The earthquake jeopardized the pending sale. Talla toured Sports Club/LA with his construction supervisor, Paul Case, to survey the damage. At that time, the insureds planned to resume operations within four weeks. Less than a week after the earthquake, Case was placed in charge of the earthquake reconstruction effort. Concurrently, Case was in charge of the construction of a new athletic club for Talla in New York. In addition to his regular salary, Case was also paid $12,000 a month by MKDG, with a $100,000 completion bonus for his work on the Sports Club/LA. The entire salary paid by MKDG was submitted as part of the insureds' claim. Instead

of simply repairing the earthquake damage, however, the insureds completed a "state of the art" remodel of Sports Club/LA, and also repaired certain uninsured buildings across the street.

Shortly after the earthquake, MKDG agreed to pay Talla $10,000 a day purportedly for allowing Sports Club/LA members to use Talla's other athletic clubs in the area. In addition to providing such substitute facilities, the insureds informed all Sports Club/LA members that their dues would be abated in full. The primary insurer's representatives were advised that this arrangement would last only a few weeks, but the insureds allegedly knew and intended that this arrangement would last seven and a half months. The fees paid by MKDG to Talla as well as the "lost income' from abatement of dues were both submitted to Agricultural as part of MKDG's asserted business interruption and extra expense claim. The cross-complaint implies, but again does not expressly state, that the payment of these fees might have been for the purpose of preserving the sale transaction, rather than necessary expenses of operating Sports Club/LA after the earthquake.

The insureds hired a public adjuster, Adjusters International, to prepare their claim. Adjusters International submitted an "Estimated Costs Report" to the insureds, estimating the earthquake damage to Sports Club/LA as $2,105,885.47. Instead of notifying the insurers of this estimate, the insureds discharged Adjusters International. Case then assumed the responsibility for preparing the insurance claim. A few weeks later, Case submitted to the insurers a document entitled "Preliminary Building Repair Estimate" estimating the property damage at $9,026,733.

The approximate $7 million discrepancy between the two estimates allegedly resulted from the fact that Sports Club/LA was not only being repaired, but was also undergoing a "state of the art" remodel. The decision to engage in a voluntary remodel triggered a need to comply with various state and municipal codes, including building codes, disabled access codes, and health and safety codes. Case submitted several permit applications and construction plans to the city. When he submitted the structural repair plans after the earthquake, no disabled access division (DAD) repairs, improvements, and/or upgrades were required. This was because the plans showed that the proposed structural repairs were to the existing lateral bracing system and did not propose any new structural system. However, when Case submitted tenant improvement plans a month later, DAD plan checking was performed and DAD improvements and/or upgrades were required. The tenant improvement plans involved moving walls and partitions and changing the existing floor plan without any apparent relationship to the need for earthquake repair. The city consequently required DAD repairs and improvements.

The excess insurers were advised of the "Preliminary Building Repair Estimate" in excess of $9 million in June 1994. They immediately scheduled a site visit, which took place in late June 1994. By then, the "state of the art" remodel was almost complete.

The insureds submitted to Agricultural a partial sworn proof of loss in the amount of $2 million in September 1994. It was paid immediately. In December 1994, the insureds submitted to Agricultural another partial sworn proof of loss in the amount of $973,966. Agricultural again promptly paid, but this time under a reservation of rights.

On May 18, 1995, the insureds submitted a "Sworn Statement of Proof of Loss" to Agricultural, claiming the whole $5 million of Agricultural's excess policy limit. At that time, the insureds stated the amount of "Whole Loss and Damage by Earthquake" to be $24,161,145.

To support the insurance claim submitted by the insureds, disbursement books containing invoices for work allegedly performed were compiled on a monthly basis and copies were submitted to the insurers. These disbursement books contained invoices for work performed at buildings located at uninsured locations. In its briefing (although not in the cross-complaint itself), Agricultural alleges examples: In March 1994, a lawsuit was filed against the insureds by the owner of an uninsured location known as the "Missouri Building," which was leased to the insureds. The lawsuit alleged that the insureds had made structural alterations to the Missouri Building that were not approved by the owner of the property and for which no permits had been issued. After it was determined that there was no insurance coverage for this problem and that the insureds would be responsible for the repair of their landlord's building, the insureds settled their landlord's lawsuit and agreed to repair the Missouri Building. They allegedly attempted to avoid this loss, however, by disguising work done at the Missouri Building as earthquake repair to Sports Club/LA. In some instances, the entry identifying the location of work performed at uninsured locations was whited-out with Liquid Paper and replaced with a designation of Sports Club/LA. In other instances, the original entry showing the location of the work identified Sports Club/LA, despite the fact that the work was performed at either the Missouri Building or at another uninsured location known as the "Kid's Club." The cost of such uncovered work was allegedly subtracted from the insureds' claim only after Agricultural investigated and disputed coverage, and after Agricultural had already paid the first two partial sworn proofs of loss in their entirety, totaling approximately $2,973,000.

The invoices in the disbursements books and the insurance claim submitted by the insureds allocated costs into three categories: "earthquake," "code

upgrade," and "upgrade." The "earthquake" category was supposed to include only costs incurred solely as a result of the earthquake. The "code upgrade" category was supposed to include costs incurred as a result of code upgrades mandated by certain governmental agencies as a result of the earthquake reconstruction. The "upgrade" category was supposed to include costs incurred as a result of the "state of the art" remodel. Agricultural's investigation revealed that the costs were improperly allocated among the three categories for the purpose of charging Agricultural for work not covered under the insurance policy. For example, the insureds concealed from Agricultural the fact that the tile in the wet areas of Sports Club/LA was already defective and cracked prior to the earthquake. Agricultural contends in its briefing that Case had declared under penalty of perjury in a lawsuit prior to the earthquake that the decision had already been made that this tile had to be completely replaced. After the earthquake, however the insureds claimed coverage for total replacement of the tile and misrepresented that the tile was damaged in the earthquake.

In addition to misallocating costs, the insureds represented that the millions of dollars of expense incurred to comply with mandatory code upgrades was a result of the damage to the property from the earthquake and was not a result of their voluntary and unilateral "state of the art" remodel. Agricultural's investigation revealed that the insureds' representations were false and that most, if not all, of the mandated code upgrades were due to the insureds' voluntary decision to remodel Sports Club/LA to a "state of the art" health club. Agricultural now additionally contends that the appraisal proceeding, completed after the filing of its cross-complaint, establishes that MKDG inflated its insurance claim by millions of dollars. Agricultural's cross-complaint prayed for general damages, for punitive damages, for moneys received from Agricultural by the insureds, for attorney's fees, costs and interest.

E. *The Insureds Demur and Move to Strike.*

The insureds demurred to Agricultural's cross-complaint on two grounds relevant here. First, as to the "reverse bad faith" cause of action, the insureds contended that "[u]nder California law, 'reverse bad faith' may be pled by an insurer as an affirmative defense, but not as a cause of action seeking affirmative relief against its insured."[3] Second, as to the fraud claim, the insureds contended that the cross-complaint failed "to allege with sufficient

---

[3]The somewhat related issue of whether a liability insurer, being sued by its insured for failing to settle a third party liability claim within policy limits, may assert the comparative

specificity certain of the elements" of a fraud claim, in particular the specific representations, their dates, by whom made, how they were authorized, and to whom at Agricultural they were communicated. The insureds also moved to strike Agricultural's prayer for punitive damages and for attorney's fees.

### F. *The Trial Court Decision.*

The trial court sustained the demurrers to Agricultural's fraud and "reverse bad faith" causes of action without leave to amend. Notwithstanding that the insureds had demurred to the fraud claim only on grounds of lack of adequate specificity, the trial court sustained without leave on the theory that an insurer may never sue its insured for any kind of tort. The trial court also granted the insureds' motion to strike Agricultural's prayer for punitive damages and for attorney's fees. This petition for writ of mandate followed.

## II. THE "REVERSE BAD FAITH" CLAIM

 Agricultural's effort to characterize the alleged actions of the insureds in this case as a tortious breach of the covenant of good faith and fair dealing, or "reverse bad faith," finds no support in case law. The circumstances of insured and insurer are significantly different, and hence the law that governs the conduct of insureds and insurers is also different. Although there is an implied covenant of good faith and fair dealing in every contract, although each party is bound by it, and although this principle applies to insurance contracts (see, e.g., *Liberty Mut. Ins. Co.* v. *Altfillisch Constr. Co.* (1977) 70 Cal.App.3d 789, 797 [139 Cal.Rptr. 91]), the potential liability for breach is different for insurers and insureds. In summary, an insured may be held liable in contract for breaching the covenant, but cannot be held liable in tort.

---

bad faith of its insured as an affirmative defense, is now pending before the California Supreme Court in *Kransco* v. *American Empire Surplus Lines Ins. Co.* (S062139) review granted August 20, 1997. Agricultural filed its initial writ petition directly in the Supreme Court, asking the Supreme Court to grant direct review in the instant case on the theory that the issue in *Kransco* and the issue in the instant case were closely related. However, even if the Supreme Court rules that an insurer can assert reverse bad faith as an affirmative defense in a third party situation, such a ruling would not answer the question of whether an insurer can seek an affirmative tort recovery for reverse bad faith in a first party situation. Even putting aside the distinctions between the first party versus the third party context, the two issues pose significantly different considerations. The Supreme Court may have recognized these significant distinctions when it declined to accept direct review in order to decide this case in conjunction with *Kransco*. As noted above, we will hold that an insurer may not sue its insured for an affirmative tort recovery on grounds of reverse bad faith. Nothing we decide, however, has any bearing on the third party, failure-to-settle-within-policy-limits issue presented in *Kransco*.

*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] involved an effort to import the theory of tortious breach of covenant from insurance law into employment law. In rejecting that effort, the Supreme Court explained the circumstances necessary to transmute a contractual breach into a tort. *Foley* initially noted that "[b]ecause the covenant is a contract term . . . compensation for its breach has almost always been limited to contract rather than tort remedies." (*Id.* at p. 684.) *Foley* then acknowledged that "[a]n exception to this general rule has developed in the context of insurance contracts where, for a variety of policy reasons, courts have held that breach of the implied covenant will provide the basis for an action in tort." (*Ibid.*) ▇ In explaining why tort recoveries have been allowed for breach of covenant in the insurance context notwithstanding the "general rule" that breach of covenant gives rise only to contractual remedies, *Foley* reviewed case law and scholarly commentary and identified several elements that supported tort remedies against a breaching insurer. These elements all involve the significant distinctions between the objectives and circumstances of an insurer versus the objectives and circumstances of an insured. We summarize them here: An insured seeks peace of mind and economic protection against calamity, the insurer provides that protection for a fee. Although the insured depends upon the insurer for protection, the insurer does not depend on the insured in the same manner. Insurers occupy the " ' "status as purveyors of a vital service labeled quasi-public in nature." ' " (*Id.* at pp. 684-685.) Thus an insurer's obligations can include a duty to place the interests of the insured on at least an equal footing with its own interests, because the " ' "obligations of good faith and fair dealing encompass qualities of decency and humanity" ' " similar to the responsibilities of a fiduciary. (*Id.* at p. 685.) Insurance contracts are usually adhesive in nature, since their terms are generally contained in form language dictated by the insurer. Critically, breach of an insurance contract places an insured in a type of dilemma not experienced by an insurance company if an insured should breach a term of the policy. (*Ibid.*) "[T]he insured cannot turn to the marketplace to find another insurance company willing to pay for the loss already incurred." (*Id.* at p. 692.) An insurer's breach can therefore frustrate the core purpose of insurance (protecting the insured from calamity) and leave the insured exposed to a disaster it has paid to avoid. The insurance company, by contrast, faces no comparable dilemma. The insurer's exposure to potential tort liability thus flows from special factors which do not apply to the insured.

The line of reasoning laid out in *Foley* was followed in *California Fair Plan Assn.* v. *Politi* (1990) 220 Cal.App.3d 1612 [270 Cal.Rptr. 243] (*Politi*). *Politi* acknowledged that "[t]he covenant of good faith and fair dealing is

implied in all contracts," but also noted that "while a breach of the covenant by an insurer results in an action which sounds both in tort and contract, the same is not true when an insured breaches the covenant." (*Id.* at p. 1618.) Thus "[a]n action by an insurer against its insured for breach of the covenant of good faith and fair dealing only sounds in contract and, thus, any recovery must be limited to contract damages." (*Ibid.*, citing *Liberty Mut. Ins. Co.* v. *Altfillisch Constr. Co., supra,* 70 Cal.App.3d at p. 797.) As the court in *Liberty Mut. Ins.* explained, "a breach [of the covenant of good faith and fair dealing] by the insured would lead to the same legal consequences as any garden variety breach of contract." (*Liberty Mut. Ins. Co.* v. *Altfillisch Constr. Co., supra,* 70 Cal.App.3d at p. 797.) The *Politi* court thus reversed an award of attorney's fees against an insured for breach of covenant, since attorney's fees could be awarded only upon a finding of tortious breach. (*Politi, supra,* 220 Cal.App.3d at p. 1619.)

██ Agricultural argues that the insureds in the instant case include business entities controlled by wealthy individuals, and contends that the law exposes a wealthy insured to the potential of tort liability for breach of the covenant of good faith and fair dealing even though the law does not similarly expose a less wealthy insured to such tort liability. Agricultural's theory is that a wealthy insured has equal bargaining strength with an insurer, and hence should be exposed to the same tort liabilities as an insurer.[4] This argument appears based on the premise that the only reason why insurers are subject to tort liability for breach of covenant is that insurers generally have more bargaining strength than insureds. This premise is incomplete, and hence has led Agricultural to a faulty conclusion. As discussed above, there are other reasons why insurers, but not insureds, are exposed to potential tort liability for breaching the covenant, key among them that an insured cannot buy protection after a loss has already occurred. Agricultural relies primarily on *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253] to support its theory, but *AIU* does not support it. *AIU* concerned, insofar as relevant to this question, an issue of contract interpretation. *AIU* considered whether an insurance contract should be construed against the insurer (the general rule) even if the insurer and insured were of equal bargaining power and had jointly negotiated and drafted the policy. *AIU* determined that the general rule does not

---

[4]Agricultural alleges that MKDG is a partnership controlled by Marvin Davis and that Davis is one of the wealthiest individuals in America. Agricultural notes that Forbes magazine valued Davis's wealth at $2.2 billion in its "Class of '96, Richest 400 People In America" issue. (Marsh, *Over $2,000,000,000. (The Forbes Four Hundred)* (Oct. 14, 1996) Forbes.) Agricultural contends by comparison that it has a surplus of only $1.3 billion, and hence is less wealthy than its insureds.

necessarily apply when a policy has been specially negotiated between parties of equal bargaining strength, stating "that where the policyholder does not suffer from lack of legal sophistication or a relative lack of bargaining power, and where it is clear that an insurance policy *was actually negotiated and jointly drafted*, we need not go so far in protecting the insured from ambiguous or highly technical drafting. (*Garcia* v. *Truck Ins. Exchange* [(1984)] 36 Cal.3d [426,] 438 [204 Cal.Rptr. 435, 682 P.2d 1100] [refusing to resolve ambiguity against insurer when insured enjoyed 'substantial bargaining power vis-à-vis the carrier,' and actually negotiated and joined in drafting terms of coverage]; see also 13 Appleman, Insurance Law and Practice (1981) § 7402, pp. 300-301 ['it has been held that the principle that ambiguities in insurance policies should be strictly construed against the insurer need not be strictly adhered to in instances where one large corporation and one large insurance company both advised by competent counsel do business with each other'].)" (*AIU Ins. Co.* v. *Superior Court, supra*, 51 Cal.3d at p. 823, italics added.) *AIU* has no application here for two reasons. First, there is no issue of contract interpretation presented here. Second, even if there were an issue of contract interpretation, there is no allegation that the policy involved here was "actually negotiated and jointly drafted." Thus, even accepting as true Agricultural's allegation that the wealthy insureds here had bargaining power equal to or greater than Agricultural, *AIU* provides no basis for a ruling that the same words in an insurance policy can impose varying duties on different insureds according to their respective levels of wealth.

Agricultural also contends that it must be permitted to sue for "reverse bad faith" because Penal Code section 550, subdivision (a)(1) provides that it is a criminal offense to "[k]nowingly present or cause to be presented any false or fraudulent claim for the payment of a loss . . . including payment of a loss . . . under a contract of insurance." This contention also fails, for two reasons. It fails first under the analysis set forth in *Crusader Ins. Co.* v. *Scottsdale Ins. Co.* (1997) 54 Cal.App.4th 121 [62 Cal.Rptr.2d 620] (whether a statute creates a private right of action depends upon legislative intent). (*Id.* at p. 125.) There is no indication that the Legislature, in enacting Penal Code section 550, intended to expose all insureds to suits for "reverse bad faith" whenever they make an insurance claim. The motivations of a public prosecutor deciding whether and how to enforce a penal statute will expectably be significantly different from the motivations of a private litigant reacting to an insurance claim. One is vindicating public policy and the rule of law, the other is primarily concerned with its own private economic interests. There is no indication that the Legislature equated these two quite different situations. There is no language creating a private right of action in

Penal Code section 550, thus any legislative intent to create such a private right would have to be implicit at most. Yet nothing has been cited or suggested indicating such a silent legislative intent, nor why, if the Legislature did so intend, they did not simply say so. If the Legislature did not intend to create a new private right of action, then the Legislature did not create a new private right of action. No basis has been suggested here for a finding that the Legislature did so intend.

Agricultural's contention that Penal Code section 550 creates a new private right of action fails secondly because the nebulous concept of "bad faith" is not coterminous with the better-defined concept of fraud. The Legislature did not attempt to criminalize "bad faith" in Penal Code section 550, and probably could not do so constitutionally. (See, e.g., *Lanzetta* v. *New Jersey* (1939) 306 U.S. 451, 452-458 [59 S.Ct. 618, 618-621, 83 L.Ed. 888] [due process case finding invalid on its face as vague and uncertain a penal statute punishing a "member of a gang" not engaged "in any lawful occupation" as a "gangster," and reversing conviction]; *Williams* v. *Garcetti* (1993) 5 Cal.4th 561, 575-577 [20 Cal.Rptr.2d 341, 853 P.2d 507] [criminal statute must be definite enough to provide a standard of conduct and a standard for police enforcement and ascertainment of guilt].) For reasons explained later in this opinion, Agricultural is entitled to sue for fraud. It does not follow from that fact that Agricultural is entitled to sue for "reverse bad faith," whatever elements Agricultural may consider included within the "reverse bad faith" concept.

The trial court was therefore correct in sustaining the insureds' demurrer to Agricultural's "reverse bad faith" claim without leave to amend.

## III. THE FRAUD CLAIM

The insureds did not contend in the trial court that an insurer cannot sue its insured for fraud. Instead, they contended only that Agricultural should be required to file a more specific pleading. The trial court nevertheless sustained without leave to amend on theory that *Politi, supra,* 220 Cal.App.3d 1612, had precluded any tort recovery by an insurer against an insured. In this court, the insureds rightly agree that an insurer can sue its insured for fraud in the inducement of an insurance policy. While Agricultural's complaint could be pleaded with more clarity, it at least appears potentially susceptible to amendment to clearly plead fraud in the inducement. The demurrer to Agricultural's fraud claim should not have been sustained without leave to amend for that reason alone. The main thrust of

the debate on this writ proceeding, however, concerns Agricultural's contention that the insureds committed fraud by filing a factually false insurance claim after procuring the policy.

The insureds first contend that Agricultural's fraud claim cannot be permitted simply because it is based upon the same factual allegations that Agricultural unsuccessfully attempted to characterize as "reverse bad faith." The insureds argue that "[i]t would undermine the public policy rule precluding insurers from obtaining a tort recovery against their insureds for breach of the duty of good faith and fair dealing to allow an insurer to make an 'end run' around that prohibition by asserting a fraud claim when all of the purportedly fraudulent activity arises out of the claims process . . . ." As discussed above, we have concluded that an insurer cannot recover in tort for "reverse bad faith." However, the reason for that conclusion was not that Agricultural is unable to allege fraud. The fraud claim presents a question separate from the bad faith question. The relatively modern concept of "bad faith" is quite indistinct, and can mean many different things to different people. The relatively ancient concept of fraud, by contrast, is far more well-defined and, consequently, far more circumscribed. The insureds have voiced a legitimate concern that allowing an insurer to sue on a nebulous "reverse bad faith" theory could open up avenues for abuse by insurers, and contend that the same thinking applies to an insurer claim for fraud. It does, but not with the same force, since common law fraud is a much better-defined concept.

Civil Code section 1572 provides: "Actual fraud . . . consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: [¶] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; [¶] 3. The suppression of that which is true, by one having knowledge or belief of the fact; [¶] . . . or, [¶] 5. Any other act fitted to deceive." This statutory definition of actual fraud encompasses claims of the type advanced by Agricultural, and includes fraudulent misrepresentations made "by a party to the contract." It follows that fraud can be committed by a party to the contract during the insurance claims process.

Agricultural appears to be attempting to allege actual fraud during the claims process in at least these respects: false claims were submitted to it for

construction work done on uninsured buildings, false claims were submitted to it for the repair of conditions which predated the earthquake, false claims were submitted to it for the installation of improvements rather than for the repair of earthquake damage, and false claims were submitted to it for business accommodations undertaken for the purpose of preserving the contract for sale of MKDG's interest in Sports Club/LA but misrepresented as necessary ongoing business expenses covered by business interruption coverage.

■ The elements which must be pleaded to plead a fraud claim are "(a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778.) "It is not essential to liability for fraud that the person charged should have received any benefit therefrom." (*Ibid.*) The element of intent makes the fraud actionable regardless of any contractual or fiduciary duty one party might owe to the other. (*Lacher* v. *Superior Court* (1991) 230 Cal.App.3d 1038, 1046 [281 Cal.Rptr. 640].) The misrepresentation element must normally be satisfied by an affirmation of fact. (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 677, p. 778.) "A representation of opinion is ordinarily not actionable. And a representation is one of opinion 'if it expresses only (a) the belief of the maker, without certainty, as to the existence of a fact; or (b) his judgment as to quality, value, authenticity, or other matters of judgment.' [Citation.]" (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 678, p. 779.)

■ Although it facially appears that Agricultural can plead all the elements of a fraud cause of action, debate has focused on the element of justifiable reliance. Yet the facts alleged by Agricultural could satisfy this element as well. When a claim is made to an insurer, that insurer's duty of investigation is triggered. (See, e.g., Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1998) ¶ 12:866 et seq.)[5] Since the insurer has a legal duty to investigate, it cannot be said that an investigation conducted pursuant to that legal duty is unjustified. Investigations cost money. When a legally required, and hence justified, investigation is conducted into a factually false claim, and the insurer consequently incurs expenses that would otherwise have been unnecessary, the insurer is damaged. Assuming that it can be pleaded with specificity that the claim was

---

[5]The insureds, represented by skilled claimants' insurance lawyers, themselves note that "[i]n the insurance context, an insurer has a mandatory duty to thoroughly investigate the claim."

false in a factual sense, and not merely in the sense of the insured's inflated opinion of value, and that the insurer can allege scienter and intent, all the elements of a common law fraud claim would be present. No legal basis appears on which it could be said that any element is lacking. If, as the insureds argue, an insurer should not be permitted to sue its insured for fraud as a matter of public policy, the remedy is for the Legislature to consider all the public policy implications of allowing insurers to sue for fraud versus the public policy implications of insulating insureds from fraud claims during the insurance claims process, all in light of the various other provisions of law which may bear on the pros and cons of this question. At present, we are presented with a situation in which all the elements of a fraud claim either have been or can be pleaded, and we have no basis on which to preclude Agricultural from proceeding.

The insureds rely heavily on *Orient Handel* v. *United States Fid. & Guar. Co.* (1987) 192 Cal.App.3d 684 [237 Cal.Rptr. 667] for the proposition that an insurer may never sue its insured for fraud. *Orient Handel* does not support this contention. In *Orient Handel*, the insurer contended that its insured had either staged or exaggerated a loss resulting from the theft of rugs. Although the jury found that a theft of at least some rugs had occurred, it also found that the insured had exaggerated its extent (apparently by contending that far more rugs were stolen than were actually stolen). A fraud verdict was entered in favor of the insurer. (*Id.* at p. 692.) On appeal, the Court of Appeal observed the general rule that each necessary element of the theory underlying a judgment must be supported by substantial evidence. Upon reviewing the evidence of reliance, the court found that the evidence of the reliance element was insubstantial in the unique circumstances there presented. (*Id.* at pp. 693-696.) The substantial evidence discussion in *Orient Handel* is of ambiguous import. It might be read to say that since an insurer has a duty to investigate a claim anyway, the insurer cannot suffer damage by being required to incur excessive costs to investigate a factually fraudu-lent claim. So read, the reasoning of *Orient Handel* would be of dubious validity. More important than its discussion of the effects of an insurer's duty to investigate, however, is the legal basis stated for the opinion. The *Orient Handel* court unequivocally stated that the insurer there cited "no evidence in the record indicating that its decision to investigate or the extent of its investigation depended in any measure on the amount of the loss claimed. . . . There was no substantial evidence supporting the element of actual and justifiable reliance by respondent on any misrepresentations or concealment by appellants as to the amount of the loss in investigating the claim." (*Id.* at p. 696.) The court consequently concluded that "in the absence of proof that respondent actually and justifiably relied on the

misrepresented amount of loss in investigating the claim, the claim itself having been proven to be based on an actual burglary and theft from the insured premises, respondent may not recover the costs of that investigation from its insureds as damages for fraud." (*Ibid.*) Amount of loss (or number of rugs) was the primary issue in *Orient Handel*. If it was true that the insurer had expended no additional funds as a consequence of the false portions of the insured's claim, then there was no damage in *Orient Handel*. The same result would follow in the instant case. Even if Agricultural could prove the other elements of a fraud claim, if it cannot prove that it was damaged (for example, that it incurred investigation expenses which would not have been necessary but for the insureds' factually false claims), the insureds will be entitled to judgment in their favor just as was the insured in *Orient Handel*. The substantial evidence ruling in *Orient Handel* has no bearing on the pleading issue in the instant case. The petition will therefore be granted with respect to Agricultural's fraud claim.

The trial court never ruled on the actual basis for demurrer advanced by the insureds, their claim that Agricultural's pleading was not sufficiently specific. That issue has consequently not been briefed in any detail, and we do not rule upon it. Instead, we leave ruling on that issue to the sound discretion of the trial court.

## IV. PUNITIVE DAMAGES

Should the trial court, after whatever amendments it might require, find that Agricultural has successfully pleaded a fraud claim against the insureds, Agricultural must then be permitted to pursue its punitive damage claims. (See, e.g., 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1350, p. 811.) The petition will therefore be granted to this extent with respect to Agricultural's prayer for punitive damages.

## V. ATTORNEY'S FEES

The trial court also struck Agricultural's prayer for attorney's fees. In this connection, Agricultural argues only that if it may proceed on its tort claim for "reverse bad faith," then it may seek attorney's fees as tort damages on the authority of *Brandt v. Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796]. However, Agricultural may not proceed on its tort claim for reverse bad faith, and has demonstrated no other potential basis for recovery of attorney's fees. The petition is therefore denied as to attorney's fees.

## VI. Disposition

Let a writ of mandate issue directing the superior court to set aside its order sustaining, without leave to amend, the demurrer to petitioner Agricultural Insurance Company's cause of action for fraud, and directing the superior court instead either to overrule that demurrer or to sustain it with leave to amend to plead with greater specificity, and also directing the superior court to set aside its order striking petitioner Agricultural Insurance Company's prayer for punitive damages, and to reconsider that ruling in light of the superior court's final disposition of petitioner's fraud pleading. The petition is otherwise denied. Each side to bear its own costs.

Boren, P. J., and Nott, J., concurred.