[No. B136083. Second Dist., Div. Two. June 26, 2002.]

DAVID J. PASTERNAK, as Receiver, etc., Plaintiff and Respondent, v. DEMETRIOS A. BOUTRIS, as Commissioner, etc., Defendant and Respondent;
ESCROW AGENTS' FIDELITY CORPORATION, Real Party in Interest and Appellant.

**COUNSEL**

Robertson, Vick & Capella, Michael G. Evans; Gascou, Gemmill & Thornton and William P. Gemmill; for Real Party in Interest and Appellant.

Wolff, Ellis & Clausen, Gerald Clausen and Joan Wolff for Escrow Institute of California as Amicus Curiae on behalf of Real Party in Interest and Appellant.

Buchalter, Nemer, Fields & Younger, Holly J. Fujie, Donald Lee, Michael A. Cabotaje; Pasternak, Pasternak & Patton and David J. Pasternak for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

**OPINION**

**COOPER, J.**[*]—This appeal, from a judgment granting a writ of administrative mandamus (Code Civ. Proc., § 1094.5), concerns the statutory responsibility of appellant Escrow Agents' Fidelity Corporation (EAFC) to indemnify for losses suffered by member escrow agents as the result of fraudulent misappropriation of trust obligations by their owners, officers, or employees. (Fin. Code, § 17300 et seq.)[1] At issue is the superior court's rejection of a decision by the acting Commissioner of Corporations (commissioner),[2] which denied an administrative appeal by David J. Pasternak (receiver), receiver of Escrow Plus, Inc. (EP), from EAFC's denial of the receiver's claim for compensation on account of approximately $24 million taken by EP's president, as part of fraudulent scheme purportedly involving viatical purchases of life insurance policies. The trial court held that the commissioner had erred in concluding that the EP transactions did not involve escrows, and that two particular findings of fact were not supported by substantial evidence.

Appealing, EAFC defends the commissioner's findings and decision. Amicus curiae Escrow Institute of California further contends that a release by the receiver of EP's president exonerated EAFC of responsibility to the receiver. We conclude that the trial court correctly ruled that the subject

---

[*]Presiding Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]Undesignated section references hereafter are to the Financial Code. Division 6 of that code, section 17000 et seq., is entitled (§ 17000), and is referred to herein, as the Escrow Law.

[2]The present commissioner has been automatically substituted in the title of this decision.

transactions involved escrows, and therefore the loss was subject to coverage by EAFC. We disagree in part, however, with the court's other challenged findings, particularly with regard to how many reimbursable losses EP suffered. Finally, we reject amicus curiae's contention that EAFC has been exonerated.

## FACTUAL BACKGROUND

We state the background facts of this controversy, drawing primarily on findings of fact by the commissioner that are not in dispute. In 1996, EP, a licensed escrow company, was owned equally by Marla Martinez and Valerie Jenkins. Jenkins served as EP's president and chief financial officer. In May 1996, PCO, Inc., a company owned by David Laing and doing business as Personal Choice Opportunities (PCO), approached EP to engage its services in connection with viatical settlements. Viatical setttlements involve payment to a terminally ill person (viator) in exchange for being named as beneficiary of the viator's existing life insurance policy, bearing death benefits exceeding the amount paid. EP agreed to serve as escrow company for these transactions. Neither PCO nor Laing was licensed in California to enter into such settlements. Moreover, their program for funding and implementing the settlements actually was fraudulent, as explained below.

PCO's program involved loans by individuals, which theoretically were to be used to buy qualified life insurance policies. The lenders were to receive 25 percent interest, and repayment of the amount lent, after one year. Under a "Lender Agreement" to this effect, the loan funds were initially to be deposited in escrow with EP.[3] Concurrently, PCO was to deposit verification of an insurance policy's face value, an irrevocable change of beneficiary, the viator's agreement, and a confidential medical prognosis. Under the "Deposit Receipt and Instructions," EP was to hold the first three of those documents, and also a medical evaluation and diagnosis, the Lender Agreement, the deposit receipt and instructions itself, and Laing's irrevocable authorization for the insurance company to send policy benefits to EP. EP was to be entitled to draw its fees first, before paying interest to the lenders; any remaining funds after interest would be paid to PCO, for purchase of more policies and payment of commissions. "Escrow Agreements" recited that policies PCO purchased would be held in escrow as collateral for the lenders, and their loans would be repaid from policy proceeds.

The Escrow Agreements described the escrows as being for safekeeping of policy purchase documents and lender funds, which would be disbursed to

---

[3] Whether the "escrows" set up for the program legally constituted escrows within the meaning of the Financial Code is a central issue in this case. We provisionally use the term escrows in describing the arrangements that are claimed to constitute them.

purchase policies. An escrow would be opened upon receipt of the loan, the Escrow Agreement, and the Deposit Receipt and Instructions. Funds would be disbursed only if EP held the documents specified by the latter. No disbursement would be made unless EP confirmed that the policies had been sold and transferred to PCO. All such policies would be "pooled" and held as collateral for the loans; lenders were not tied to specific policies.

The first lender escrow account was opened on July 26, 1996. Later in 1996 and in 1997, Laing solicited funds in group meetings, in which EP's Jenkins participated, explaining EP's role. After a major such meeting in Denver in February 1997, subscriptions and payments by lenders accelerated to approximately $1.5 million to $2 million per day. Approximately 1,700 escrow accounts ultimately were established. Altogether, the total of loans received was approximately $89 million. EP took fees of about $2.7 million.

Through Jenkins, EP disbursed $48.5 million of lender funds, mostly to Laing or persons he designated. However, the viatical settlement program was a sham. Neither PCO nor Laing entered into any such settlements, or acquired any policies. EP never received insurance company documentation, nor any policy benefits.

Laing apparently did tender policy-related documents to EP, but all were fraudulent. The Federal Bureau of Investigation (FBI) seized 23 envelopes at Jenkins's home, which Laing had allegedly delivered to EP. They contained forged letters purporting to confirm that named individuals were covered by a Prudential group life insurance policy, which actually did not cover them. The policy and the misrepresented verifying individual were affiliated with the University of California, Riverside, where Laing was employed. The envelopes also contained forged designations of Laing as beneficiary, "seller agreements" for the fictitious policy coverages, unmailed letters from Laing to Prudential claiming beneficiary status, and fabricated physician's notes, reciting terminal diagnoses. Martinez, EP's co-owner, testified to seeing Laing bring several of these envelopes to EP.

There was no evidence that Jenkins relied on any of these documents in making her disbursements of lender money from escrow. Moreover, even had the documents been genuine, the disbursements yet violated the escrow instructions, in that Jenkins did not receive any policies, confirmations that they had been sold and transferred to PCO, directions for payment to EP, or required documentation that the policies had no suicide penalty.

Following a tip by a former marketing manager for PCO, the Department of Corporations (department) investigated EP's activities. The department's

auditor concluded that the PCO program did not involve escrows as statutorily defined in section 17003. On February 27, 1997, the department issued a desist-and-refrain order to Laing and PCO, against offering securities by way of interests in promissory notes, or investment contracts in the form of loans for viatical agreements, without proper qualification or exemption. Jenkins and Martinez continued to receive lender funds in March 1997, in Nevada. On April 4, 1997, Laing, Jenkins, and others were arrested, and the PCO operation was terminated.

A receiver was appointed for PCO, and as of October 22, 1998 he had recovered, out of $89 million originally deposited in escrow, approximately $56 million, $44 million coming from EP and the rest from Laing. The next month, Jenkins pled guilty to a federal charge of conspiracy to commit mail fraud. Laing also was convicted, and imprisoned.

On December 31, 1997, plaintiff-respondent Pasternak was appointed receiver of EP. On February 20, 1998, he filed a claim in the form of a proof of loss with EAFC, seeking recovery on account of losses caused by Jenkins. We briefly summarize the legal structure involved.

EAFC is a nonprofit mutual benefit corporation, of which each state-licensed escrow agent is a member. (§ 17311, former § 17312.) Funded by its membership, EAFC affords indemnity against "loss of trust obligations" (§§ 17314, subd. (a)), with coverage of between $1 million and $5 million per location, depending on the member's monthly average escrow liability. (§§ 17310, subd. (a), 17314, subds. (a), (b).) The subjects of this coverage are described in a series of statutory definitions. A "trust obligation" includes "[a]ll money and property deposited with a member . . . in an escrow . . . ." (§ 17302, subd. (a).) A "loss" means "the loss of trust obligations held by a member . . . as a result of the fraudulent or dishonest abstraction, misappropriation, or embezzlement of trust obligations by an officer, director, trustee, stockholder, manager, or employee of a member." (§ 17304.) EAFC is to pay a member's loss to the member or its successor in interest. (§ 17314.3, subd. (b).)

In sum, EAFC reimburses for losses of money, deposited in an escrow, that has been fraudulently or dishonestly misappropriated by an owner or employee of the escrow agency. The definition of "escrow" in this context, which is at the crux of the present appeal, appears in section 17003. At the time of the events in suit, that definition read as follows: " 'Escrow' means any transaction wherein one person, for the purpose of effecting the sale, transfer, encumbering, or leasing of real or personal property to another person, delivers any written instrument, money, evidence of title to real or

personal property, or other thing of value to a third person to be held by such third person until the happening of a specified event or the performance of a prescribed condition, when it is then to be delivered by such third person to a grantee, grantor, promisee, promisor, obligee, obligor, bailee, bailor, or any agent or employee of any of the latter."[4]

The receiver's claim initially asserted a loss of $10 million, sustained in June 1997, as a result of Jenkins's dishonesty. However, the amount claimed exceeded $24 million, allegedly representing about $91 million taken from escrows, less approximately $66.5 million that had been recovered. The claim alleged that Jenkins and perhaps others at EP had misappropriated the funds by making disbursements from escrow accounts with knowledge both that their conditions for disbursement had not been fulfilled and that the underlying transactions were fraudulent. The receiver asserted that the maximum allowable amount of coverage applied.

On May 21, 1998, EAFC issued a decision denying the receiver's claim. The principal grounds for the denial were that EAFC did not cover losses attributable to a fraudulent securities scheme, and that EP's escrows did not legally constitute escrows, because the underlying agreements were fraudulent rather than lawful, and PCO had not intended to perform. EAFC also ruled that under the provisions gearing its coverage to the escrow company's average monthly escrow liability (§ 17314, subd. (b)), EP's maximum coverage was $3 million.

The receiver filed an administrative appeal to the commissioner. (§§ 17345, 17345.1, subd. (a).) As provided by section 17345.1, an evidentiary hearing of the appeal proceeded before an administrative law judge (ALJ). The extensive hearing elicited numerous documentary exhibits. Following briefing, the ALJ issued his proposed decision, to deny the receiver's appeal.

In its factual findings, the proposed decision reviewed the history of the claim and the underlying transactions, as summarized above. The decision further found that Jenkins's participation in the PCO scheme, and her disbursements to Laing, did constitute "fraudulent [and] dishonest abstraction [and] misappropriation," within the meaning of section 17304's definition of "loss." However, the decision proceeded to render a legal conclusion (No. 1) that the loss was not covered by EAFC, because the money had not

---

[4]Hereafter we refer to the version just quoted as section 17003. That text was formally amended in 2000 without any change of meaning. At that time it also was designated as subdivision (a) of the section, with the addition, in subdivision (b), of new language concerning Internet escrow companies.

been taken from escrows. Statutory escrows did not exist because (1) Laing had not had a legitimate purpose to transfer property, but only a purpose to obtain funds through fraud; (2) neither Laing nor PCO delivered anything of value to EP, but at best delivered fraudulent documents; and (3) there was consequently no transfer of a thing of value. "Absent the critical elements of legitimate purpose, delivery of a thing of value, and transfer of a thing of value no 'escrows' were created under section 17003."

The proposed decision also found that in October 1998, the receiver had entered into certain settlement agreements with Jenkins and Martinez, which included general releases of them. Although EAFC had argued that the settlements impaired its subrogation rights and hence relieved it of responsibility to the receiver, the decision found it unnecessary to determine whether the settlements had so affected subrogation rights.

The proposed decision included two further findings that the receiver later specifically challenged. In finding of fact No. 32c, the ALJ found that Martinez's "vague and general testimony" about the contents of envelopes from Laing that she had examined was insufficient to establish that the more numerous documents, which had been produced at the hearing as fruits of an FBI search of Jenkins's home, had been delivered to EP by Laing in connection with the PCO transactions. Second, in finding No. 58, the decision stated, "The PCO scam through which millions of dollars of lender funds were abstracted and misappropriated constitutes a 'systematic and organized scheme,' " within the meaning of *Eott Energy Corp. v. Storebrand Internat. Ins. Co.* (1996) 45 Cal.App.4th 565 [52 Cal.Rptr.2d 894] (*Eott*), a case holding that multiple, orchestrated thefts would constitute a single "occurrence." In an accompanying footnote, the ALJ added that in light of the supervening legal conclusion that there was no EAFC coverage, "it is unnecessary to resolve the legal issue of whether the holding of *Eott* and the cases cited therein are relevant to interpreting section 17314," which provides for the amount of coverage.

The commissioner adopted the proposed decision as his decision of the appeal. The receiver then commenced the present proceeding in administrative mandamus. The petition named the commissioner as respondent and EAFC as real party in interest.[5] It alleged that the commissioner's legal conclusion No. 1, that there had been no escrows, was not suppported by the findings, and that in reaching it the commissioner had not proceeded as required by law. In addition, the petition challenged, as unsupported by substantial evidence, administrative finding No. 32c, regarding the delivery

---

[5]The commissioner did not participate in the superior court proceedings, and has not appeared here.

of documents to EP by Laing, and finding No. 58, regarding Jenkins's abstractions having been a systematic scheme. (Code Civ. Proc., § 1094.5, subd. (b).)

The receiver moved for a peremptory writ. After briefing and argument, the superior court rendered its tentative decision, in the receiver's favor. Observing that the substantial evidence test applied, the court first stated that regardless of how Martinez's testimony had been characterized, it was the sole evidence on the issue of delivery by Laing to EP, and the ALJ had not found it unbelievable. Hence, "the failure to find at least what Martinez testified to is not supported by substantial evidence."

The court also rejected finding No. 58, regarding a systematic scheme, which it perceived to be "more of a legal conclusion than a finding of fact." The court stated it had not reached the same conclusion, and "substantial evidence shows multiple losses relating to separate and distinct decisions." Finally, the court determined that the commissioner's conclusion that there had not been escrows was erroneous, because (1) the statutory definition did not require a "legitimate purpose to transfer property," (2) things of value —i.e., money—had indeed been delivered to EP, and (3) the circumstances that Jenkins and Laing had acted improperly and that the escrows had not been consummated did not disqualify the escrows, which had been created.

On August 12, 1999, the court issued its statement of decision, and a judgment granting a peremptory writ of mandamus. The statement of decision stated as follows. First, the commissioner's finding No. 32c, that there was insufficient evidence to establish that the documents in 23 envelopes seized from Jenkins's home ("policy envelopes") had been delivered by Laing to EP, was itself not supported by substantial evidence, "in that the evidence compels a finding that the Policy Envelopes were delivered by Laing to E[P]," by reason of Martinez's testimony and other factors. In other words, "the failure to find that the Policy Documents were delivered to E[P] by Laing is not supported by substantial evidence."

Second, finding No. 58, that the PCO scam though which Jenkins misappropriated funds was a "systematic and organized scheme" under *Eott, supra,* 45 Cal.App.4th 565, was not supported by substantial evidence, "in that substantial evidence supports a finding that [¶] (1) Each separate submission of each of the twenty-three (23) sets of Policy Documents by Laing to E[P] . . . resulted in a separate decision by Jenkins to make a fraudulent and dishonest misappropriation of funds placed in escrow; [¶] (2) Each separate decision by Jenkins to make a fraudulent and dishonest misappropriation of funds placed in escrow constitutes a separate loss . . . ."

Finally, the statement of decision concluded that the commissioner's legal conclusion No. 1, that the PCO transactions did not constitute escrows as defined by section 17003, was not supported by the findings, and that in making it the commissioner had failed to proceed in the manner required by law. In summary, the reasons the findings did not support the conclusion were that each lender had delivered money into an EP escrow account, "for the purpose of effecting the transfer and encumbering of personal property to PCO," which money was, upon the happening of an event, to be delivered to PCO "as obligor, promisor and bailor." (Cf. § 17003.) The findings further showed that Lender Agreements, Deposit Receipts and Instructions, and Escrow Agreements also were deposited in each escrow. The fraudulent documents in the policy envelopes, deposited by Laing and PCO, "evidenced the purported encumbering of personal property [the policies] intended by the lenders." Moreover, the fact that Laing and Jenkins did not complete the viatical process "does not alter the fact that escrows were created." In sum, the findings reflected the existence of all elements of an escrow under section 17003.

Furthermore, the court ruled, the commissioner had not proceeded as required by law, because (1) his no-escrow conclusion did not follow the requisites of section 17003, which did not require a legitimate purpose as an element of a valid escrow, and (2) the fraud of Jenkins and Laing did not disqualify the escrows, but rather made EAFC indemnification applicable. In conclusion, "The PCO accounts at E[P] constituted 'escrows' as defined under [section] 17003, and the amounts abstracted therefrom by the fraudulent actions of Valerie Jenkins are therefore 'losses' [citation] to 'trust obligations' [citation] subject to EAFC's indemnity obligation to its member E[P] under [section] 17314."

The court's judgment directed issuance of a writ remanding the proceedings to the commissioner, and commanding him to set aside his decision with regard to finding No. 32c (as to which the court had held substantial evidence supported an opposite finding of delivery), finding No. 58 (as to which the evidence supported a finding of multiple decisions and losses, as set forth in the statement of decision), and conclusion of law No. 1, as to which the court had held that escrows and losses subject to indemnity had occurred. The commissioner was to reconsider his action in light of the statement of decision.

EAFC moved for a new trial, and to set aside the judgment under Code of Civil Procedure section 663, subdivision 1. Both motions were denied. The

court also denied EAFC's motion to stay the judgment pending appeal.[6] EAFC filed its notice of appeal, and sought a writ of supersedeas, which we granted.

DISCUSSION

1. *The Existence of Escrows.*

 The issue pivotal to the receiver's claim for indemnity by EAFC is whether Jenkins's misappropriations of lender funds involved a loss (or losses) covered by EAFC, because the funds were taken from escrows, as defined by section 17003. The commissioner ruled that these misappropriations had not involved escrows. The trial court disagreed. Before addressing the issue and its components, we consider the applicable scope of review about which the parties disagree.

EAFC asserts that whether the EP-PCO transactions involved escrows was a mixed question of law and fact, which should be reviewed as a factual issue, with deference accorded to the commissioner's determination. We believe, rather, that the escrow question is a legal one, deserving de novo review of both the trial court's and, where appropriate, the commissioner's determinations. Several reasons substantiate this approach. The commissioner specifically treated his own resolution of the escrow issue as a "legal conclusion." Analytically, the issue does present a mixed question, involving applying the law defining escrows (primarily § 17003) to undisputed facts. But because "the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278]; see also *People v. Louis* (1986) 42 Cal.3d 969, 985-987 [232 Cal.Rptr. 110, 728 P.2d 180].) Moreover, the trial court's conclusion that the commissioner's decision of this issue was not supported by the findings likewise merits de novo review (cf. *DeRasmo v. Smith* (1971) 15 Cal.App.3d 601, 609-610 [93 Cal.Rptr. 289]), as does the conclusion that the commissioner misconstrued section 17003. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 544 [35 Cal.Rptr.2d 574].)

 We turn to the issue, whether the trial court correctly ruled that the PCO transactions involved escrows, so that Jenkins's misappropriation from them gave rise to loss subject to EAFC coverage. The court first made a

---

[6]The trial judge having retired, these motions were heard and determined by another judge.

positive determination, that the facts found by the commissioner reflected and fulfilled all elements of the statutory definition of escrow, set forth in section 17003 (*ante,* pp. 913-914)—a definition that has remained effectively unchanged since the initial enactment of the Escrow Law in 1947. These facts showed a transaction in which the lenders, for the purpose of transferring their money to PCO, delivered it to EP, to be held until the performance of a condition or event, namely PCO's deposit with EP of specified documents, at which point the money was to be delivered to PCO, as promisor and obligor, or bailee. On its face, this arrangement fully satisfied and qualified under section 17003.[7]

The objections to this conclusion variously offered by EAFC here and by the commissioner in his decision are not compelling. The commissioner ruled that certain supposed elements of an escrow had been absent, namely a "legitimate" purpose to transfer property, delivery of a thing of value, and transfer of such a thing of value. This analysis incompletely and incorrectly viewed the transaction from Laing's standpoint, rather than the lenders'. The described lack of purpose was Laing's, that is, he did not, apparently from the outset, intend to transfer anything of value. But the lenders genuinely intended to transfer their monies, deposited with EP for that purpose, to Laing, to enable him to make viatical settlements and pay the lenders interest.[8] Similarly, Laing may not have delivered anything of value at his end of the escrow, but the lenders did at theirs. Indeed, in the course of asserting that PCO delivered nothing of value to EP, EAFC acknowledges that "The only items of value delivered to Escrow Plus were the funds which the investors contributed." Finally, the notion that nothing of value was or could be transferred at the end of the escrow is doubly misconceived. Again, the lenders' money surely qualified. Moreover, section 17003 does not require a completed delivery from escrow in order for there to be an escrow. Rather, the existence of an escrow, as defined, requires only that the transaction contemplate such delivery. The delivery that must occur is the initial deposit.

EAFC's further arguments are also ineffective. The assertion that there was no transfer of insurance policy benefits is immaterial in light of the deposit and intended delivery of the lender funds. EAFC cites *Elliott v. Title Ins. & Trust Co.* (1923) 64 Cal.App. 508, 511 [222 P. 175], and *Security-First Nat. Bk. v. Clark.* (1935) 8 Cal.App.2d 709, 712 [48 P.2d 167], for the

---

[7]The court referred to the lenders' purpose as also being to encumber personal property, meaning the insurance policies, which were to be held as collateral for the loans. This analysis is superfluous, and we do not pursue it, or the challenges to its validity that EAFC poses.

[8]We therefore need not explore the receiver and the court's further point that section 17003 does not, specifically or otherwise, require a "legitimate" purpose. Even if an escrow depositor's purpose must be real, not fictitious, the intentions of the lenders unquestionably were so.

proposition that an escrow requires a binding contract between the parties. These cases antedate section 17003, which does not specifically speak of a contract. Nevertheless, such contracts were present here, in the form of the Lender Agreements and Escrow Agreements, both of which PCO and the lenders executed. Although EAFC avers that the requisite contract must be a "valid" one, the cited cases do not so state, and in any event the agreements in question were both binding and "valid," even if PCO entered into them without intention to perform. (E.g., 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 403, pp. 363-364.) EAFC's correlative contention that EP served merely as a depositary, not an escrow agent, because of provisions allowing additional disbursements for the purchase of further policies, is not supported by either the authority or the portions of the record cited.

EAFC also argues that the court's analysis of how the transactions fulfilled and comported with section 17003 does not correspond to the requirement that the transaction be for the purpose of transferring property. EAFC urges that the lenders' funds were not to be permanently transferred to PCO, with title changing, but were eventually to be returned. But there is no requirement in the statute that a transfer of title be the purpose or goal of an escrow. Indeed, section 17003 identifies the leasing of property as one of the contemplated purposes. Nor do the escrows in this case fail to provide for delivery to one of the types of recipients the statute lists: at the very least, PCO was to be a bailee of the lenders' funds. EAFC itself observes that "transfer of property results in a 'bailee' . . . ." And neither a bailment nor most of the other types of transactions represented by section 17003's enumeration of transferees requires an exchange of property. Moreover, EAFC's characterization of the deposits as being for purposes of investment also does not exceed section 17003's dimensions. Many traditional real estate transactions utilizing escrows are performed for the purpose of investment as well as transfer or creation of an interest in land.

EAFC's argument gains no assistance from its references to other portions of the administrative record. For example, that EP employed for PCO transactions a computer program that had been adapted from the software EP used with "construction fund control" transactions did not convert the escrows into some kind of "fund controls," not qualified for EAFC coverage. (See § 17005.1.) Nor did the commissioner's charging PCO and EP with securities law violations negative the presence of escrows in the program. EAFC's expert's characterization of the escrows as "holding accounts" is inconsequential, both because the objective features confirmed the escrows as statutorily defined ones, and because the expert's purportedly distinguishing factors were principally that the program assertedly involved securities purchases, whereas independent escrow companies did not usually handle such transactions.

Accordingly, we agree with the trial court that EP's escrows from which Jenkins's misappropriation occurred constituted escrows within the meaning of section 17003, and hence EAFC provided coverage on account of that misappropriation.

### 2. *Delivery of the Policy Envelopes.*

The receiver's writ petition disputed the commissioner's finding No. 32c, to the effect that EP co-owner Martinez's "vague and general testimony" regarding the contents of envelopes containing viatical documents which Laing had brought to EP was insufficient to establish that the 23 policy envelopes, seized from Jenkins's home and containing similar documents, had been delivered to EP by Laing. Those envelopes contained fabricated documents that corresponded with many of those whose receipt was the condition for EP's release of lender monies to Laing. The trial court found this finding not supported by substantial evidence, "in that the evidence compels a finding that the Policy Envelopes were delivered by Laing to E[P] . . . ." EAFC challenges this rejection of finding No. 32c.

The issue is actually of marginal significance, in that the finding only relates cumulatively to the trial court's further determination that EP suffered as many covered losses as there were policy envelopes. Although we hold below that that determination is unsound for other reasons, we nevertheless consider the court's' rejection of finding No. 32c. We conclude that the court's reaction was essentially correct.

Finding No. 32c is set forth in the margin.[9] The trial court construed it as not just an evaluation of Martinez's testimony but a negative finding about delivery, i.e., that the evidence, consisting of Martinez's testimony, failed to establish that Laing had delivered to EP the 23 policy envelopes which were later seized from Jenkins's home and produced at the hearing. The scope of review below was whether the finding was supported by substantial evidence in light of the whole record. (Code Civ. Proc., § 1094.5, subd. (c).) We apply the same test to the finding in reviewing the trial court's treatment of it. (Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 2001) ¶ 8:128.2, p. 8-63.)

The basis for the commissioner's finding, as well as the trial court's rejection of it, was Martinez's testimony about the policy envelopes. She

---

[9]"Jenkins did not testify at the hearing. Absent her testimony, Martinez' vague and general testimony about some of the contents of some of the envelopes is insufficient to establish that the documents produced at the hearing were delivered by Laing to E[P] in connection with the PCO transactions."

testified that she had seen Laing bring unsealed envelopes to EP. She had examined the contents of two or three of them, and "part of one other one." As she could recall, the contents included "a letter from a doctor . . . an agreement between the viator and Mr. Laing . . . an insurance form of sole beneficiary form [sic] which would state the policy number and the amount of the insurance policy . . . [and] a confidentiality agreement between Mr. Laing and the person who was selling the insurance. [¶] That's all I can recall right now."[10] Asked how many envelopes Laing had brought to EP, Martinez explained that she had seen more than those she inspected, and that a list of the envelopes was maintained at EP by Jenkins and two other individuals, which indicated that there were 23. The envelopes were first kept in a safe at EP, but beginning about February 1997 they were stored in a safe at Jenkins's home. The envelopes were sealed after delivery to EP, because of confidentiality agreements.

Despite EAFC's claim to the contrary, finding No. 32c expressed no doubt concerning the credibility of Martinez's testimony. Rather, the finding deemed her testimony about the contents of the envelopes that she looked into "vague and general." That characterization is inapt. Martinez described virtually all of the types of documents that were contained in each of the 23 policy envelopes produced at the hearing. At least with respect to the envelopes she personally saw Laing deliver, her testimony fully supported, if not mandated, a finding that he delivered policy envelopes later found at Jenkins's home. There is no substantial evidence to the contrary, and to this extent the trial court did not err in finding that the commissioner's finding was unsupported.[11]

With regard to those policy envelopes that Martinez did not witness Laing deliver, her testimony about the envelopes she reviewed, and her further testimony that Jenkins stored at home 23 envelopes from EP, constituted powerful circumstantial evidence, even if not direct, that Laing had delivered to EP all 23 envelopes, which were later seized from Jenkins and produced at the hearing. Regardless of any initial reservations by the ALJ about limited admissibility or weight of the envelopes and their chain of custody, the ALJ and the commissioner did find (in finding No. 32a) that the 23 policy envelopes had been seized at Jenkins's residence. And there was additional evidence supporting Laing's delivery of these envelopes to EP. A department examiner testified that in February 1997 Jenkins had shown her a numbered envelope (as were the policy envelopes), which contained

[10]When she repeated this summary on cross-examination, Martinez added, "I keep thinking there must be something else, but that's all I can recall now."

[11]EAFC characterizes the court's listed rationales for its determination as "new findings." They are not findings, but rather expressions of reasons for the finding ultimately reached.

documents that referred to the University of California and Prudential Insurance (as did the policy envelopes). Moreover, the presence of Laing's signature on various documents in each envelope bespoke that he was their source.

Ultimately, then, Martinez's testimony strongly and uncontradictedly supported the proposition that the policy envelopes seized at Jenkins's home and presented at the hearing had originally been delivered to EP by Laing. With respect to the envelopes Martinez saw Laing deliver, her testimony was conclusive. As to the rest, it was circumstantial, but it was also uncontradicted. With respect only to those envelopes, the court went too far in stating that the evidence "compel[led] a finding" that Laing delivered the policy envelopes to EP. But the ultimate finding that "[t]he failure to find that the Policy Documents were delivered to E[P] by Laing is not supported by substantial evidence" was correct.

### 3. The "Systematic and Organized Scheme," and the Number of Losses.

We next consider the commissioner's finding that the abstraction of escrow funds constituted a systematic scheme, and the trial court's superseding findings regarding the number of losses EP experienced. In this regard, we conclude that the trial court erred.

In finding No. 58, the commissioner found that "The PCO scam through which millions of dollars of lender funds were abstracted and misappropriated constitutes a 'systematic and organized scheme' within the meaning of [*Eott, supra,* 45 Cal.App.4th 565] and cases cited therein." (Fn. omitted.) *Eott* had ruled that if numerous thefts from an insured were caused by the same "systematic and organized scheme" to steal (*Eott,* at p. 578), the several takings would constitute a single "occurrence," for purposes of an insurance policy that imposed a substantial deductible for each occurrence. The commissioner, however, stopped short of holding that *Eott*'s occurrence analysis applied to "losses" covered by EAFC. In a footnote to finding No. 58, the commissioner stated, "In light of the legal conclusion set forth below [absence of escrows], it is unnecessary to resolve the legal issue of whether the holding of *Eott* and the cases cited therein are relevant to interpreting section 17314."

The trial court ruled that finding No. 58 was not supported by substantial evidence, "in that the substantial evidence supports a finding that [¶] (1) Each separate submission of each of the twenty-three (23) sets of Policy Documents [i.e., policy envelopes] by Laing to E[P] . . . resulted in a separate decision by Jenkins to make a fraudulent and dishonest misappropriation of funds placed in escrow; [¶] (2) Each separate decision by Jenkins

to make a fraudulent and dishonest misappropriation of funds placed in escrow constitutes a separate loss under . . . Section 17321."[12] The court thus not only rejected finding No. 58 to its own extent, but in the process affirmatively determined that EP had suffered 23 losses, by reason of Jenkins's allegedly having reacted to each of the policy envelopes with a separate decision to misappropriate. Both rulings were improper.

In its tentative decision, the trial court had stated that finding No. 58 deserved treatment as "more of a legal conclusion than a finding of fact." Not so. The finding of a systematic and organized scheme within the meaning of *Eott, supra,* 45 Cal.App.4th 565, was a mixed determination of law and fact, but one primarily involving a factual, practical evaluation. It therefore constituted a factual finding, subject to review under the substantial evidence test, both by the trial court and again here. (*Crocker National Bank v. City and County of San Francisco, supra,* 49 Cal.3d 881, 888; see *Eott, supra,* 45 Cal.App.4th at p. 578 [existence of systematic and organized scheme presented triable issues of fact].) But even were the issue deemed to merit de novo review, the result would be the same. The evidence substantially and unequivocally supports the finding that a systematic and organized scheme propelled and embraced Jenkins's takings from the PCO escrows. That is, substantial evidence clearly demonstrated that both the organization and structuring of the PCO viatical settlement fraud, with its escrow system and procurement of lender funds, and Jenkins's disbursement of those funds to Laing, comprised a systematic, organized scheme.

The trial court therefore could not properly characterize finding No. 58 as unsupported by substantial evidence. And the means and reasoning by which the court did so were also incorrect. The court held that the finding lacked substantial evidentiary support, in that substantial evidence supported an alternative finding, that each submission of a policy envelope by Laing resulted in a separate decision by Jenkins to misappropriate escrow funds, and a conclusion that each such decision constituted a separate loss, reimbursable by EAFC. There are several flaws in this analysis.

First, the finding of 23 decisions, tied to policy envelopes, is itself not supported by substantial evidence. There was no direct evidence about Jenkins's decisionmaking processes with respect to disbursements and the policy envelopes. To the contrary, the commissioner found that "There is no evidence that Jenkins relied on any document contained in the envelopes to

---

[12]The judgment corrected this statutory reference as being to sections 17310, subdivision (a), and 17314, subdivision (a), which obligate EAFC to indemnify members for losses, as defined in section 17304.

disburse money from the PCO accounts." The receiver did not challenge that finding. Nor does the evidence otherwise perceptibly link EP's disbursements to Laing—of which there were more than 23—with the submission of policy envelopes. Moreover, in affirmatively finding the alleged 23 decisions, the court exceeded its function of review under Code of Civil Procedure section 1094.5. (See *Stanton v. State Personnel Bd.* (1980) 105 Cal.App.3d 729, 736 [164 Cal.Rptr. 557].)

Second, the court's finding of numerous decisions by Jenkins did not necessarily contradict the presence of a systematic and organized scheme. In *Slater v. U.S. Fidelity and Guaranty Co.* (1980) 379 Mass. 801 [400 N.E.2d 1256] (*Slater*), the court held that repeated embezzlements, which the parties had stipulated had been made pursuant to a common scheme, yet amounted to separate occurrences, in that "each act of appropriating money . . . necessarily was preceded by a decision to adhere to and effectuate that scheme . . . ." (400 N.E.2d at p. 1261.) Thus, the trial court's finding that separate decisions negated an organized scheme was incorrect, just as was the disavowal of substantial evidence for the latter on the basis that substantial evidence supposedly showed the former. (See *McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1786, fn. 4 [52 Cal.Rptr.2d 466].)

Our conclusion that the trial court erred in overruling the commissioner's finding No. 58, and in rendering a superseding finding about the number of decisions to misappropriate Jenkins made, also eliminates the basis for the court's further conclusion, that EP suffered 23 losses for purposes of EAFC reimbursement. Indeed, the record and the commissioner's decision point squarely to a conclusion that there was only one loss as a result of Jenkins's misappropriations. In finding No. 58, the commissioner adumbrated that conclusion, but stopped short of rendering it, in view of his preemptive ruling that covered escrows had not been involved. Our determination to the contrary makes resolution of the question of losses ripe. Moreover, the parties and amicus curiae have addressed it, and the question is a legal one, essentially involving applying the Escrow Law to facts that are not disputed.[13]

EAFC's relevant statutory framework does not directly resolve the issue. Once again, EAFC's purpose (§ 17310, subd. (a)) and duty (§ 17314, subd. (a)) are to indemnify a member "for loss of trust obligations . . . ." (*Ibid.*) Section 17304 defines " 'loss' " as "the loss of trust obligations held by

---

[13]The relevant facts being undisputed, it would serve no salutary purpose to submit the question for administrative consideration, to be followed by definitive judicial review later.

a member . . . as a result of the fraudulent or dishonest abstraction, misappropriation, or embezzlement of trust obligations by an officer, director, trustee, stockholder, manager, or employee of a member"—as was found here with respect to Jenkins.[14] Under section 17314, subdivision (b), coverage is provided in amounts ranging from $1 million to $5 million, depending on the "monthly average escrow liability per location." The commissioner found, and there is no dispute, that for the relevant period EP's coverage pursuant to this section was $3 million.[15] "A deductible shall apply to each loss suffered by a member," consisting of $5,000 plus 5 percent of the amount by which the loss exceeds $5,000. "If a member with more than one licensed location suffers a covered loss at more than one location, the deductible shall apply to each location separately in proportion to the amount of the loss suffered at each such licensed location." (§ 17314.3, subd. (a).)

The text of these statutory provisions sheds little light on whether more than one covered loss occurs when, as here, an escrow agency officer makes several misappropriations of the agency's trust obligations as part of a single, systematic and organized scheme. However, those statutory features that do bear on the question point toward one loss. The provision contemplating occurrence of such a loss at several agency locations, and requiring allotment of the per-loss deductible among them (§ 17314.3, subd. (a)), indicates that more than one taking may comprise a single loss. And the same is true of section 17304's references to "trust obligations," in the plural, in the definition of "loss" itself.

Statements by EAFC's president, Daniel Bovill, made at both the administrative hearing and an earlier time when there was no controversy, also support the understanding that a single scheme would produce a single loss. Bovill testified that there could be several separate covered losses, if they involved unrelated takings. During the early days of the PCO program, he also wrote to Jenkins that "[EAFC] indemnifies E[P] for losses of its trust obligations due to misappropriation or embezzlement on a per occurrence basis."

■ Acknowledging that the statutory terms do not provide a definitive answer, the receiver contends that the issue should be decided by reference to the principles that ambiguities in insurance policies are resolved against

---

[14] " 'Trust obligation' means: [¶] (a) All money and property deposited with a member . . . in an escrow . . . ." (§ 17302, subd. (a).)

[15] This was based on an average monthly escrow liability of $3,655,959 for 1996.

the drafter, usually the insurer, and generally in accordance with the insured's reasonable expectations. (E.g., *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) But those principles do not govern here, because the question of loss arises not under an insurance policy, drawn by an insurer, but under a statute, composed by the Legislature. (Cf. *Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 684 [274 Cal.Rptr. 387, 798 P.2d 1230] ["the statute . . . should not be construed strictly against the insurer (unlike ambiguous or uncertain policy language)"].) Moreover, the "expectations" of extensive coverage that the receiver cites were essentially self-generated by PCO, Laing, EP, and Jenkins, for the consumption of lenders. And EAFC's above quoted avowal that its indemnity ran "on a per occurrence basis" does not resolve the question of how many "occurrences," as so phrased, transpired in this case.

The parties and amicus curiae also invoke judicial decisions regarding insurance coverage for multiple instances of embezzlement or theft, as well as others involving liability insurance policies. The context and reasoning of the embezzlement cases are naturally more apposite to enlighten the issue before us. And those decisions predominantly conclude that multiple takings performed as part of a systematic scheme give rise to only one insured loss —a conclusion that we share in this context.

Cases from numerous jurisdictions have discerned only one covered "occurrence," under fidelity or employee dishonesty policies, in a series of embezzlements by an employee pursuant to a common scheme or episode of dishonesty. For example, *Business Interiors, Inc. v. Aetna Cas. & Sur. Co.* (10th Cir. 1984) 751 F.2d 361 (*Business Interiors*) held that a $53,000 embezzlement, accomplished by forging or altering 40 checks over seven months, constituted one loss, subject to $10,000 indemnity. The court found that the employee's "continued dishonesty" was the cause of the loss, just as the court below had observed that the employee's intent in writing additional checks after the first one had been to continue the previous dishonesty, " 'not to commit an entirely new and different act of dishonesty.' " (*Id.* at p. 363.)

Similarly, in *Christ Lutheran v. State Farm Fire & Cas.* (1996) 122 N.C. App. 614 [471 S.E.2d 124], an employee's 13-month embezzlement of $32,000, by writing 24 checks, was determined to have constituted one occurrence, consisting of related acts. The court held that the checks had been written in furtherance of a continuum of dishonest acts by the employee, not a series of "new and individual act[s] of dishonesty." (471 S.E.2d at p. 126.) The same held true in *Valley Furniture v. Transportation Ins. Co.* (2001) 107 Wash.App. 104 [26 P.3d 952], in which a payroll manager, over

six years, embezzled for herself and two other employees amounts well exceeding the limit of liability per occurrence. (See also *Jefferson Parish v. Fidelity & Deposit Co.* (La.Ct.App. 1996) 673 So.2d 1238 [repeated withholdings of employee trust monies constituted one occurrence under "commercial crime" policy, as the "acts were integral parts of a scheme to deprive the Trust Fund of current premiums" (673 So.2d at p. 1245); *Howard, Weil, Labouisse, Friedrichs v. Ins. Co.* (5th Cir. 1977) 557 F.2d 1055 [several dishonest commodities trades on employer's account over four days constituted one loss for purposes of employee dishonesty bond's per-loss deductible, one ongoing episode having produced the loss].)

In the related area of property insurance against theft, *Peco Energy Co. v. Boden* (3d Cir. 1995) 64 F.3d 852 held that a "multitude of thefts" of oil by a trucking company "over [a] six-year period constituted a single occurrence" (*id.* at p. 855), because they all were part of a scheme to steal which was the cause of each. The court elaborated, "We therefore hold that when a scheme to steal property is the proximate and continuing cause of a series or combination of thefts, the losses for liability [*sic*] insurance purposes constitute part of a single occurrence." (*Id.* at p. 856.) Decided under Pennsylvania law, *Peco Energy* in turn was followed on similar facts as a matter of California law in *Eott, supra,* 45 Cal.App.4th 565.

Against this spectrum of authority, the receiver cites *Slater, supra,* 400 N.E.2d 1256, which held that each act of embezzlement by an employee over two years constituted a separate occurrence, even though the takings occurred pursuant to a " 'plan or scheme' " (400 N.E.2d at p. 1258), in part because each act "necessarily was preceded by a decision to adhere to and effectuate that scheme, which could have been interrupted at any time before the [total amount] was taken. The scheme, without more, could not have caused the losses." (*Id.* at p. 1261.) We do not find this reasoning persuasive. Its notion of separate decisions simply aggrandizes the individual acts of taking. And the quoted refutation of the causal capacity of a scheme is rhetorical. Moreover, the *Slater* court relied in part on "the rule that ambiguities are to be construed in favor of the insured" (*ibid.*), which we have previously observed does not govern our analysis here.

Moreover, *Slater* stands relatively alone on the issue. *American Com. Ins. v. Minn. Mut. Fire* (Minn. 1996) 551 N.W.2d 224 refused to apply it, observing that "*Slater* has not been adopted by any other court considering insurance coverage in the embezzlement context." (*Id.* at p. 229.) With respect to the 155 acts of embezzlement in issue, *American Commerce* instead followed *Business Interiors, supra,* 751 F.2d 361, albeit finding two occurrences by virtue of two types of related acts, issuing unauthorized checks and diverting customer payments.

The receiver also invokes two cases involving officer and director liability insurance, *Eureka Federal S & L v. Amer. Cas. Co. of Reading* (9th Cir. 1989) 873 F.2d 229, and *Okada v. MGIC Indem. Corp.* (D. Hawaii 1985) 608 F.Supp. 383, affirmed in part and reversed in part (9th Cir. 1987) 823 F.2d 276. Apart from their entirely different insurance source, these cases are further distinguishable. In *Eureka,* the court held that separate losses were occasioned by "disparate acts and omissions by five directors" in over 200 loan transactions. (873 F.2d at p. 235.) The court rejected the argument that there had been a single loss by virtue of one corporate lending plan, observing that the loans arose thereafter from "numerous intervening business decisions," involving "the exercise of independent business judgment," and which were negligently performed. (*Ibid.*) And in *Okada,* a number of losses were held to have arisen from a series of "distinct negligent acts" (608 F.Supp. at p. 387), involving a number of disparate corporate transactions. The present record does not reflect any such pattern of independent business decisions by Jenkins in performing her disbursements from escrow to Laing.[16]

Upon consideration of the undisputed facts and the relevant authorities, we conclude that Jenkins's appropriation of funds that EP held in escrow under the PCO program constituted one loss, i.e., one "loss of trust obligations held by a member . . . as a result of the fraudulent or dishonest abstraction [or] misappropriation . . . of trust obligations by an officer . . . of a member." (§ 17304.) Although the loss involved numerous disbursements, all of them arose from and implemented the same systematic and organized scheme. As previously held, the evidence does not support the notion that Jenkins made separate decisions to misappropriate. Her disbursement of funds followed one cause and program. EP suffered one loss from the standpoint of coverage by EAFC.

4. *The Exoneration Issue.*

 The final issue we confront is raised by amicus curiae. Amicus curiae contends that, under the law governing sureties, EAFC was exonerated of duty or liability to pay the receiver for loss when, after EAFC denied

---

[16]Nor do the other two liability insurance decisions the receiver cites detract from the general rule with respect to an organized scheme. *Elston-Richards Storage Co. v. Indemnity Insurance Co.* (W.D.Mich. 1960) 194 F.Supp 673 equated "occurrence" with "event." (*Id.* at p. 682.) *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.* (5th Cir. 1971) 447 F.2d 204 held, under Texas law, that an occurrence referred to an instance of possible liability by the insured. Applying California law, the Ninth Circuit Court of Appeals, in *Chemstar, Inc. v. Liberty Mut. Ins. Co.* (9th Cir. 1994) 41 F.3d 429, took a different approach, focusing on cause. That is the approach generally followed. (See *Mason v. Home Ins. Co. of Illinois* (1988) 177 Ill.App.3d 454 [532 N.E.2d 526, 529]; *Business Interiors, supra,* 751 F.2d at p. 363.)

his claim, the receiver entered into a settlement with Jenkins, which yielded the receiver substantial fruits but also included a general release of Jenkins. The receiver responds, first, that the issue is not properly before us, because it was neither asserted nor decided in the trial court, and amicus curiae is not entitled to raise it. (See *California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1274-1275 [36 Cal.Rptr.2d 404].) Second, the receiver contends that the claim of exoneration is unfounded, most fundamentally because EAFC is not a surety, nor subject to the rules governing sureties.

We find it appropriate to decide the exoneration question posed by amicus curiae. Essentially the same issue was raised in the administrative proceedings, although the commissioner ultimately did not decide it, in view of his conclusion that there had been no escrows.[17] The receiver has responsively briefed the matter. The issue is a legal one, presented under uncontested facts. Were we not to address it now, the question would be subject to another round of administrative and trial court consideration, with the prospect of the same appellate review later.

On the merits, amicus curiae's position is not persuasive. Amicus curiae contends that the receiver's release of Jenkins operated to discharge EAFC vis-à-vis the receiver by reason of provisions governing sureties, specifically Civil Code sections 2810 and 2819. But amicus curiae necessarily concedes that EAFC is not a surety, first and foremost because its duties to the receiver arise from special statutes (e.g., §§ 17310, 17314, subd. (a)), not contractual undertakings (see Civ. Code, § 2787 [defining sureties]).[18]

Nor do the terms of Civil Code sections 2810 and 2819 readily apply to EAFC. These statutes employ the standard terminology of a surety relationship, in which the surety undertakes to answer for the default of a principal with respect to the latter's obligation to a creditor or obligee. Civil Code

---

[17]Before the ALJ, EAFC moved to dismiss the receiver's administrative appeal, on grounds the settlement and release with Jenkins impaired EAFC's right of subrogation (under § 17332), and thus, under surety principles, exonerated EAFC of responsibility for the losses Jenkins had caused. The receiver opposed the motion on several grounds. In his decision, the commissioner stated that in light of the conclusion regarding escrows, it was "unnecessary to determine whether the settlement agreement between [the receiver] and Jenkins and/or Martinez adversely impacted [EAFC's] subrogation rights under section 17332."

EAFC did not again pose the issue until its reply brief on this appeal, which summarily urged that we decide it. We therefore consider the issue as presented by amicus curiae.

[18]In *Escrow Agents' Fidelity Corp. v. Superior Court* (1992) 4 Cal.App.4th 491, 493 [5 Cal.Rptr.2d 698], the court, by way of background, stated that EAFC had been established "to act as the fidelity surety for the trust obligations of licensed escrow agents in California." The opinion proceeded to explain that "The purpose of EAFC is to indemnify its member agents against loss of trust obligations . . . ." (*Ibid.*) The colloquial reference to "surety" was not meant to decide the issues presently presented.

section 2819 provides that "A surety is exonerated, except so far as he or she may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended. . . ." But application of this statute to the present situation would presuppose a suretyship relationship, including an "obligation" of Jenkins that is not readily perceptible. Similarly, Civil Code section 2810 provides that a surety is not liable "if . . . there is no liability upon the part of the principal at the time of the execution of the contract, or the liability of the principal thereafter ceases . . . ." But there was no such "contract," by Jenkins, in this case.

These incongruities arise in part because EAFC's prescribed duties are to act as an indemnitor, not a surety. Section 17310, subdivision (a) makes this explicit. ("It shall be the purpose of [EAFC] to indemnify a member against loss . . . .") The distinction is clear. ██ "[A] contract of surety involves a direct promise to perform the obligation of the principal in the event that the principal fails to perform as required by his contract, while, on the other hand, a contract of indemnity obligates the indemnitor to reimburse his indemnitee for loss suffered, or to save him harmless from liability, but never directly to perform the obligation indemnified." (*Mahana v. Alexander* (1927) 88 Cal.App. 111, 116-117 [263 P. 260]; cf. Civ. Code, §§ 2772, 2787.) ██ As a practical matter, EAFC plainly functions as an indemnitor rather than a surety. Moreover, that understanding is not disturbed by amicus curiae's citation of Civil Code section 2778, subdivision 2, which provides that "Upon indemnity against claims or demands, or damages, or costs . . . the person indemnified is not entitled to recover without payment thereof." Even assuming, arguendo, the applicability of this provision to EAFC's indemnity against loss, the requirement of payment would be satisfied by the member's (here EP's) having suffered the loss.

Amicus curiae asserts that the rule of exoneration applicable to sureties also applies to indemnitors. But the authority amicus curiae cites does not so establish. *Massachusetts Bonding etc. Co. v. Osborne* (1965) 233 Cal.App.2d 648 [43 Cal.Rptr. 761] involved an indemnitor of a surety that had issued a bond. When the surety agreed not to execute against one of the principals, the court treated the indemnitor as a cosurety, and applied surety statutes to exonerate her. (*Id.* at pp. 661-663.) Neither the Escrow Law nor the Civil Code provides for discharge of EAFC if the member to be indemnified extends a release to a party who caused the loss. Moreover, the leading decision holding an indemnifying insurer excused in such a context did so on the basis of contractual considerations, which of course are not present here. (*Liberty Mut. Ins. Co. v. Altfillisch Constr. Co.* (1977) 70 Cal.App.3d 789, 796-797 [139 Cal.Rptr. 91].)

Amicus curiae further asserts that the Legislature must have implicitly intended that EAFC be treated as a surety, because EAFC replaced a previous requirement for fidelity bonds for escrow agents' officers and employees (§ 17203.1), from which EAFC members became exempted (former § 17311). Amicus curiae further notes that EAFC itself is authorized to provide coverage through fidelity bonds or insurance policies (§ 17310, subd. (c)(2)). These factors are beside the point of the Legislature's emplacement and positive characterization of EAFC as an indemnitor. Indeed, fidelity bonds themselves serve more to indemnify than as surety obligations, and apparently the majority view in California and elsewhere regards them as contracts of insurance rather than surety. (See Cal. Surety & Fidelity Bond Practice (Cont.Ed.Bar 1969) §§ 15.2-15.3, pp. 216-218; see, e.g., *First Hays Banshares v. Kan. Bankers Sur.* (1989) 244 Kan. 576 [769 P.2d 1184, 1187-1188].)

In a similar vein, amicus curiae contends that if EAFC were not exonerated from liability by a settlement such as the receiver's, it would lose the protection of any fidelity bond it had purchased to share its responsibility (under § 17310, subd. (c)(2)), which bond would surely be exonerated, leaving EAFC to bear the loss alone—a result the Legislature could not have intended. But this contention presupposes a contractual situation of which there is no evidence. First, section 17310, subdivision (c)(2) contemplates insurance policies as well as fidelity bonds. Second, such an undertaking presumably would be provided in favor of EAFC—which gave no release—not the releasing member. Third, a policy that is in the record does so name EAFC, both as the insured and as the party to whom the insurer is to be subrogated.

In summary, EAFC is not a surety, subject to the rules of exoneration on which amicus curiae relies, nor does its statutory status warrant application of those rules to it. Rather, EAFC's function is in the nature of an indemnitor or insurer, and there appears neither contract nor statute mandating its exoneration on account of the receiver's settlement with Jenkins. Amicus curiae's contention that the settlement exonerated and discharged EAFC is not well taken.

## DISPOSITION

The judgment is reversed, with directions to enter a new judgment granting a peremptory writ of mandate requiring the commissioner to set aside his

denial of the receiver's appeal, and to redetermine the appeal in conformity with this decision. The parties shall bear their own costs.

Boren, P. J., and Doi Todd, J., concurred.

A petition for a rehearing was denied July 25, 2002, and the petition of respondent David J. Pasternak for review by the Supreme Court was denied September 11, 2002.